Colleen Dolan, Judge
Penzel Construction Company, Inc. ("Penzel"), on the behalf of Total Electric, Inc. (Total Electric) through a liquidating agreement, brought a breach of contract action against Jackson R-2 School District ("the District") based on a breach of implied warranty for furnishing "deficient and inadequate plans and specifications" to Penzel for a construction project. The District brought third-party claims against Henthorn, Sandmeyer and Company ("Henthorn") and Warner-Nease-Bost ("WNB"). The District, Henthorn, and WNB (hereinafter collectively "Respondents") filed motions for summary judgment in July of 2015, and the trial court granted the motions on November 30, 2015. We reverse and remand for further proceedings consistent with this opinion.
*223 I. Procedural and Factual Background
A. Factual Background
The District entered into a contract with WNB as architect to build an addition to the Jackson High School ("the Project") on October 10, 2005. Subsequently, WNB entered into a subcontract with Henthorn to produce electrical plans and specifications for the Project. During the bidding phase, the District furnished the plans and specifications ("the Plans") for the Project to Penzel, who in turn gave a copy of the Plans to Total Electric. Neither Penzel nor Total Electric noticed any errors in the Plans during the bidding process. Based on the Plans, Total Electric submitted a bid of $1,040,444 to Penzel to furnish and install electrical work for the Project. On September 15, 2006, the District entered into a contract ("the Contract") with Penzel to be a general contractor for the Project. In turn, Penzel entered into a subcontract ("the Subcontract") with Total Electric to provide electrical work on the Project based on the submitted bid. The District issued a notice to proceed to Penzel on September 18, 2006, requiring substantial completion of the Project within 550 days. Total Electric substantially completed its contracted work around May 27, 2009 and claims this sixteen month delay was the direct result of the Plans' defects and inadequacies.
B. Procedural History
The procedural history surrounding the Contract and the Subcontract is fairly complicated. It involves multiple parties and causes of action that are not relevant to this appeal.[1] The case on appeal involves only Count V: a breach of contract claim by Penzel against the District under the theory that the District made an implied warranty that the Plans for the Contract were adequate and complete, pursuant to the Spearin Doctrine.[2] Penzel claims the District breached this warranty by rendering defective plans and specifications that caused damages to Total Electric. Additionally, derivative of Penzel's breach of contract claim, the District, as a third-party plaintiff and cross-appellant, filed third-party claims against Henthorn and WNB as the third-party defendants and cross-respondents.[3] Our analysis focuses on Penzel's breach of contract claim against the District, although all five parties play relevant roles.
In July of 2010, Penzel executed a liquidating agreement with Total Electric authorizing Penzel to prosecute Total Electric's claim for damages caused by its *224 reliance on the Plans furnished by the District. Penzel filed its First Amended Petition on July 21, 2010 seeking recovery for Total Electric's damages, as well as damages for Penzel's markup for overhead and profit caused by the Plans' inadequacies and deficiencies.
C. Penzel's Petition
Penzel claims that, under the Spearin Doctrine, the District impliedly warranted that the Plans it furnished were adequate for completing the Project, and the District breached the Contract by providing inadequate and defective plans and specifications, which caused damages to Total Electric. Penzel alleges the Plans were defective in a number of material ways, including (1) the inadequate low voltage switching and wiring design affecting the gymnasium and some student areas; (2) incorrect kitchen drawings; (3) the failure of the plans and specifications to call for emergency ballasts; (4) incorporating a defective gymnasium lighting design; (5) the failure to depict all the water heaters and circulating pumps requiring wiring; (6) specifications calling for outdated products; (7) non-compliance with building codes; and (8) an incorrect depiction of some site electrical work as work to be performed by others.
Penzel further alleges that Total Electric's damages were compounded by the District's and WNB's slow response time in dealing with problems on the Project. Penzel stated that Total Electric notified Penzel by e-mail of various problems encountered with the Plans, and Penzel then forwarded the e-mails to the District and WNB. Total Electric alleges it would frequently have to wait several weeks, and "sometimes months," for a response. Moreover, oftentimes the responses did not resolve the initial issue. Penzel contends that the delayed, and often ineffective, responses caused inefficiencies for Total Electric, obligating it to pay workers for being at the work site without making progress on the Project. Accordingly, Total Electric was forced to pay for an increased total of labor hours to finish the Project, which significantly increased its cost. Total Electric also claims the deficiencies and delayed responses caused the company to incur higher hourly costs for manual labor due to trade labor wage escalation.
Initially, Total Electric created daily logs for the Project to track the deficiencies in the Plans and their associated damages. However, Total Electric stopped maintaining these logs as problems persisted. Total Electric claimed it was unable to specifically track the amount of damages and extra hours attributable to each delay or distribution because the "sheer volume and variety of interfering and disruptive events" made it highly impractical. Total Electric further stated that accurately tracking and categorizing the defects and corresponding damages would have required the company to "devote multiple professionals to tracking costs," which would further increase its costs.
To prove damages for Total Electric's electrical labor loss of productivity, Penzel sought to use the "total cost method" or "modified total cost method." Penzel contends it can prove the remaining four categories of damages-consisting of (1) additional project management and supervision costs, (2) wage escalation, (3) unpaid change order work, and (4) its electrical consultant's estimated fee-without relying on either total cost method.
Due to the complexity and volume of facts in this case, we will adduce additional facts as necessary under the relevant portions of the Discussion in Sec. III.
II. Standard of Review
Whether a court should grant summary judgment is purely an issue of law.
*225 Storey v. RGIS Inventory Specialists, LLC , 466 S.W.3d 650, 654 (Mo. App. E.D. 2015). Accordingly, appellate review of a circuit court's grant of summary judgment is de novo . Id. Summary judgment is only appropriate "when the moving party has demonstrated, on the basis of facts as to which there is no genuine dispute, a right to judgment as a matter of law." Binkley v. Am. Equity Mortgage, Inc. , 447 S.W.3d 194, 196 (Mo. banc 2014) ; Rule 74.04(c).[4] We review the record in the light most favorable to the party against whom summary judgment was entered. Binkley , 447 S.W.3d at 196.
Our Court has articulated the standard a defendant-movant must meet to make a prima facie case on a motion for summary judgment:
A defendant, as the movant can establish a prima facie case for summary judgment by showing any of the following: (1) facts that negate any one of the elements of a claimant's cause of action; (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements; or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support movant's properly pleaded affirmative defense."
Storey , 466 S.W.3d at 654 (emphasis added). After the movant-defendant has made a prima facie case showing that he is entitled to judgment as a matter of law under Rule 74.04(c), "the [plaintiff's] only recourse is to show-by affidavit, depositions, answers to interrogatories, or admissions on file-that one or more of the material facts shown by the movant to be above any genuine dispute is, in fact, genuinely disputed." ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp. , 854 S.W.2d 371, 381 (Mo. banc 1993).
For the purposes of summary judgment, a "genuine dispute" exists if the record contains competent evidence of two plausible, but contradictory, accounts of essential facts. Id. at 382. In the context of summary judgment, there is a genuine dispute of a material fact only if the factual disputes might affect the outcome of the case. Am. Standard Ins. Co. of Wis. v. Stinson , 404 S.W.3d 303, 311 (Mo. App. E.D. 2012).
Before addressing Penzel's points on appeal, we will address Respondents' joint motion to strike Penzel's statement of facts and dismiss this appeal. Rule 84.04(c) controls the contents for the statement of facts in appellant and respondent briefs, stating:
The statement of facts shall be a fair and concise statement of the facts relevant to the questions presented for determination without argument. All statements of facts shall have specific page references to the relevant portion of the record on appeal, i.e., legal file, transcript, or exhibits. If the matter cited is contained in the appendix, a page reference to the appendix shall be included.
The purpose of 84.04(c) is to "define the scope of the controversy and afford the appellate court an immediate, accurate, complete, and unbiased understanding of the facts of the case." In re Adoption of C.M. , 414 S.W.3d 622, 628 (Mo. App. S.D. 2013). We find Penzel's brief complies with Rule 84.04(c) and does not offend its purpose. Accordingly, we deny Respondents' motion to strike Penzel's statement of facts, and we will review the points on appeal.
*226 III. Discussion
Penzel relies on the Spearin Doctrine to establish a breach of contract by the District. Before addressing whether Penzel has produced sufficient evidence to survive a motion for summary judgment, we must address whether its claim based on an implied warranty under the Spearin Doctrine constitutes an actionable theory of recovery in Missouri. This type of action has not previously been expressly accepted or rejected in our State. After examining Spearin and Missouri precedent, we believe Spearin claims are acceptable vehicles for bringing causes of actions based on deficient plans and specifications in construction projects involving a governmental entity-owner.
A. The Spearin Doctrine
" Spearin stands for the proposition that when a governmental entity includes detailed specifications in a contract, it impliedly warrants that [1] if the contractor follows those specifications, the resultant product will not be defective or unsafe, and [2] if the resultant product proves defective or unsafe, the contractor will not be liable for the consequences." Caddell Const. Co. v. United States , 78 Fed.Cl. 406, 410 (2007) (quoting Hercules Inc. v. United States , 24 F.3d 188, 197 (Fed. Cir. 1994), aff'd, 516 U.S. 417, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) ). However, Spearin is not merely a shield to protect the contractor from liability; it can also be used to compensate a wronged contractor. See Essex Electro Engineers, Inc. v. Danzig , 224 F.3d 1283, 1289 (quoting Chaney & James Constr. Co. v. United States , 421 F.2d 728, 732 (Ct. Cl. 1970) ) ("[A]ll delay due to defective or erroneous Government specifications are per se unreasonable and hence compensable."). The government impliedly warrants that the design plans are "reasonably accurate"; however, the specifications need not be perfect. Caddell Const. , 78 Fed.Cl. at 413 (internal quotations omitted). In determining whether the District's plans were defective, we look at the cumulative effect of these alleged errors. Id.
Spearin aligns with principles established by Missouri precedent. Ideker, Inc. v. Mo. State Highway Comm'n may be the most analogous case decided by our State's courts. 654 S.W.2d 617 (Mo. App. W.D. 1983). Ideker was a "highway contractor," that entered into a construction contract with the Missouri State Highway Commission ("the Commission"). Id. at 619. Relying upon the Commission's description of the work in its plans and specifications for the highway project, Ideker submitted a bid, which it won. Id. After starting the project, Ideker ran into problems that made the plans and specifications impossible to follow, and thus made the job impossible to complete without expending significantly more hours and money than it would have required if the plans and specifications were adequate. Id. at 619-620. Ideker brought a breach of contract action "in the nature of a breach of warranty" against the Commission. Id at 620. Ideker argued the Commission warranted that the plans and specifications furnished to Ideker were an accurate representation of what Ideker would be required to perform. Id. The Western District affirmed the trial court's judgment in favor of Ideker, reasoning:
Syllogistically, where a governmental entity makes a positive representation of a material fact relied upon by a contractor in calculating its bid, which turns out to be false or incorrect after work is commenced and occasions additional expense, the contractor finds himself in the position of one who undertakes one contract but is confronted with performance of another. The governmental entity, pragmatically speaking, gets the benefit *227 of another contract. If performance thereof by the contractor entails more expense than was calculated in submitting its bid, the governmental entity should bear the added cost rather than the contractor because the former is the beneficiary of necessary but unbargained for work resulting from its positive representation of a material fact which turned out to be false or incorrect.
Id. at 621. Although the current case is based on an "implied warranty" as opposed to a "positive representation," the logic used in Ideker still holds: if a contractor makes a bid in reliance on a governmental entity's representations of what a project will entail, he should not be punished-and the entity should not receive a windfall-because the entity's renderings were defective. See id. In effect, the contractor would be punished for having to perform a contract he did not truly agree to enter. Id. On the other hand, the governmental entity would be rewarded for failing to accurately represent the performance it sought by inducing artificially low bids from inculpable contractors. Id. This result is at odds with the notion that we should try to place parties in the same position they would be in if the contract agreed upon was performed without a breach. Id. Thus, considering contract principles established by Missouri precedent, we believe Spearin claims should be permissible causes of action in our State.
At its core, a Spearin claim is a breach of contract action. See Spearin , 248 U.S. at 137-38, 39 S.Ct. 59. In Missouri, "[a] breach of contract action includes the following essential elements: (1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." Keveney v. Mo. Military Acad. , 304 S.W.3d 98, 104 (Mo. banc 2010). Thus, a trial court should only grant summary judgment in favor of a defendant in a breach of contract action if the plaintiff fails to adduce sufficient evidence for a reasonable fact-finder to conclude that all four of the essential elements have been satisfied. See Binkley , 447 S.W.3d at 196 ("A defending party may demonstrate entitlement to summary judgment by showing that the plaintiff cannot prove one or more elements of the claim."); Rule 74.04(c). There are two elements of concern in this appeal: (1) whether the defendant actually breached the contract, and (2) whether Penzel suffered damages that it can prove with reasonable certainty. First, we will address whether Penzel has produced sufficient evidence to establish a breach.
B. Point I-Proof that the Plans were "defective" within the meaning of the Spearin Doctrine.
To establish a claim for breach of contract under Spearin , the plans and specifications must be defective or "substantially deficient." Caddell Const. Co. , 78 Fed.Cl. at 413. Plans and specifications are considered "defective" if they are "so faulty as to prevent or unreasonably delay completion of the contract performance." Id. (citing Wunderlich Contracting Co. v. United States , 351 F.2d 956, 964 (Ct. Cl. 1965) ). Because the District, as the movant-defendant, made a prima facie showing that it is entitled to summary judgment as a matter of law, Penzel is required to produce evidence to create a genuine issue of material fact. Rule 74.04(c). Penzel relies on deposition testimony from several witnesses to support its contention that the Plans were defective. Nonetheless, the District contends Penzel failed to meet its burden for proving defectiveness for several reasons: (1) Penzel was required to produce "expert testimony" to demonstrate the Plans were defective, and none *228 of the witnesses qualified as "experts" under § 490.065;[5] (2) even if Penzel's witnesses qualified as experts, their testimony was inadmissible because their opinions lacked an adequate factual basis; and (3) even if this Court rejects the District's first two arguments, the testimony proffered was insufficient to prove the Plans were defective within the meaning of Spearin . We disagree with all three of the District's assertions.
1. Penzel's Witnesses
The admissibility of expert testimony is governed by § 490.065. Am. Eagle Waste Indus., LLC v. St. Louis County, Missouri , 463 S.W.3d 11, 25 (Mo. App. E.D. 2015). "A trial court has considerable discretion in the admission of evidence, and its decision will not be reversed unless there is a clear abuse of discretion." Id. at 23 (quoting Lozano v. BNSF Ry. Co. , 421 S.W.3d 448, 451 n.2 (Mo. banc 2014). In the present case, WNB and Henthorn filed motions to exclude the expert testimony of Joseph Manzi and Myron Bernard, which the District later joined in a motion in limine. We give strong credence and great deference to the trial court's conclusion on the admissibility of expert testimony. Id. In this case, however, the trial court did not rule on any motion to exclude Penzel's expert testimony in deciding summary judgment. Accordingly, there is no ruling to which we may defer.
2. Is Expert Testimony Required?
The District contends that Penzel is required to produce "expert testimony" to establish the Plans were "defective." This argument is premised on the District's belief that implied warranty claims in Missouri "are considered fault-based claims." The District reasons that "within the context of design documents, 'fault' is established by proving that a design professional negligently prepared the design documents," which requires expert testimony. We disagree. The implied warranty in a Spearin claim is that the plans are free from significant defects; it is not simply a guarantee that a particular level of care and competency was used to create the plans. "When the government provides a contractor with defective specifications, the government is deemed to have breached the implied warranty that satisfactory contract performance will result from adherence to the specifications, and the contractor is entitled to recover all of the costs proximately flowing from the breach." Essex Electro Engineers, 224 F.3d at 1289. In Ideker , the Missouri case we found most similar to Spearin , the Western District listed six necessary elements "to constitute a cause of action...in the nature of a breach of warranty by a contractor against a governmental entity," none of which involved fault or negligence by the government-owner. 654 S.W.2d at 621. Accordingly, Penzel need not show the District fell below a reasonable standard of care to prevail on its Spearin claim, and an expert witness is not required to attest to standard of care.
Generally in Missouri, expert testimony is only required "when a fact at issue is so technical or complex that no fact-finder could resolve the issue" without it. Stone v. Mo. Dep't of Health & Senior Servs. , 350 S.W.3d 14, 21 (Mo. banc 2011). A trial court's determination of whether the facts in a case are so complicated that they require expert testimony lies within its discretion. Hill v. City of St. Louis , 371 S.W.3d 66, 78 (Mo. App. E.D. 2012). In the present case, however, the trial court did not make a ruling on any of Respondents'
*229 motions to exclude the testimony of Joseph Manzi or Myron Bernard.
Although electrical engineering is highly technical and complicated in general, most of the problems alleged by Penzel, and testified about by its witnesses, were simple enough for a layperson to understand. For example, testimony that the Plans omitted critical components, called for outdated or non-existent products, and failed to comply with building codes are issues a layperson without any technical training could understand. Accordingly, Penzel was not required to produce expert testimony to prove the Plans were substantially deficient.
3. Do either Joseph Manzi or Myron Bernard qualify as experts, and is their "expert testimony" permissible?
Even if expert testimony is not required , it is admissible "when the topic at issue is one with which lay witnesses and fact-finders are unfamiliar." Stone , 350 S.W.3d at 21. We allow expert testimony to address issues in areas in which the fact-finder lacks experience or knowledge. Id. Essentially, the admissibility of expert testimony hinges on whether it will help the jury. Johnson v. Creative Rest. Mgmt. , 904 S.W.2d 455, 459 (Mo. App. W.D. 1995).
For a witness to qualify as an expert under § 490.065, it must be shown that due to the witness's education or specialized experience, he "possesses superior knowledge" on a subject that persons without such education or experience would be incapable of forming an accurate opinion or drawing correct conclusions. Kell v. Kell , 53 S.W.3d 203, 209 (Mo. App. E.D. 2001). As long as the witness has some qualifications, the testimony may be permitted. Id. "The depth and breadth of experts' experience and knowledge are pertinent to the weight to be accorded their testimony, not to the admissibility of their opinion." Schreibman v. Zanetti , 909 S.W.2d 692, 697 (Mo. App. W.D. 1995). Furthermore, at summary judgment, the court will not test the weight of the evidence; it will only determine if there is a genuine issue of material fact. Nokes v. HMS Host USA, LLC , 353 S.W.3d 6, 10 (Mo. App. W.D. 2011).
a. Qualifications of Joseph Manzi and Myron Bernard
It is uncontroverted that Joseph Manzi ("Manzi") does not consider himself an electrical engineer, he has never been educated or trained as an architect, and he cannot prepare architectural drawings. Nonetheless, "[t]he express language of [§ 490.065.1] makes it clear that a witness may be qualified as an expert based on something other than his education or license." Scott v. Blue Springs Ford Sales, Inc. , 215 S.W.3d 145, 174 (Mo. App. W.D. 2006) (overruled on other grounds by Badahman v. Catering St. Louis , 395 S.W.3d 29 (Mo. banc 2013) ). Although Manzi has never personally designed electrical work, he explained he had familiarity with electrical work in his deposition. Manzi testified that on a number of occasions he has participated in the design of electrical systems, and he has made recommendations to electricians to ameliorate problems with the original designs of electrical systems. Moreover, he has "nearly 40 years of experience in the construction industry," and he is the president of a company that "specializes in the areas of construction/project program management, construction disputes, project cost overruns, damage analysis, loss of labor productivity, cause/effect schedule and delay assessment and review of architect, engineer and construction manager performance." Manzi also testified he is a *230 registered professional engineer in five states.
Myron Bernard ("Bernard") has more than sixty years of construction industry experience, which includes reading electrical plans and specifications and installing electrical work. Bernard has also "served as a Senior Vice President at Sachs Electric and a Senior Vice President at Guarantee Electric, two of the largest electrical contractors in the state of Missouri." Additionally, he has worked on several projects with electrical contractors, including projects managing construction projects in that field. Bernard also served as the President of the Engineers Club of St. Louis, "an organization that serves as the focal point of engineering activities in the St. Louis area."
Nevertheless, the District contends that Bernard is unqualified to testify about the electrical plans and specifications because he is not a registered architect, licensed electrician, or licensed engineer, and he has limited experience in reviewing electrical drawings. "As a general rule, any weaknesses in the factual underpinnings of the expert's opinion goes to the weight that testimony should be given and not its admissibility." Spalding v. Stewart Title Guaranty Company , 463 S.W.3d 770, 780 (Mo. banc 2015) (internal quotations omitted). Any lack of experience may affect the weight of either witness's testimony, but both Manzi and Bernard still possess "superior knowledge" that can help a jury determine if the Plans were defective within the meaning of Spearin . See Kell , 53 S.W.3d at 209. Accordingly, under § 490.065, Manzi and Bernard both qualify as experts to testify about the adequacy of the electrical specifications and drawings furnished to Penzel and Total Electric.
b. The opinion testimony of Manzi and Bernard had an adequate factual basis
Expert opinions are only admissible if they are based on facts and data that are reasonably reliable and of the same type experts in the field would reasonably rely upon to form opinions and make inferences on the subject. McGuire v. Seltsam , 138 S.W.3d 718, 721 (Mo. banc 2004) ; § 490.065.3. The sufficiency of the expert's basis for her opinion is a question of law. Heisler v. Jetco Service , 849 S.W.2d 91, 95 (Mo. App. E.D. 1993).
Generally, the sources and bases of an expert's opinion affect the weight of the opinion, not its admissibility. Whitnell v. State , 129 S.W.3d 409, 414 (Mo. App. E.D. 2004). The weight of the opinion is a question for the jury, and therefore the opinion should reach the jury "unless the expert's information is so slight as to render the opinion fundamentally unsupported." Id. The District suggests that Manzi and Bernard lacked proper foundation for their opinions because they never looked at the original plans rendered by the District and they simply "adopted the deficiencies alleged by Total Electric." Nonetheless, the District concedes that both witnesses reviewed a copy of the original Plans. However, the District argues the copies were inadequate to provide a factual basis because Total Electric had marked on them. There is nothing in the record indicating either Manzi or Bernard were swayed or influenced by the markings on the copy of the Plans. Thus, the District's assertion that the testimony is "nothing more than an adoption of Total Electric's allegations" is speculative. By reviewing the Plans, Manzi and Bernard would have the same information Total Electric did when it formulated its bid and agreed to perform the work on the Project. Reviewing the Plans and relying on *231 experience in assessing the plans and specifications for prior projects is the type of data an expert contractor would rely on in evaluating the adequacy of the Plans. Furthermore, our Court recognizes that "in most cases, expert witness opinion testimony is based on facts on which the expert did not personally observe and of which the expert did not have any personal knowledge." Am. Eagle Waste Indus., LLC , 463 S.W.3d at 25. The District would have the opportunity to question the expert witnesses' factual bases and discredit their testimony at trial; however, the record reflects that both witnesses have an adequate factual basis to opine on the adequacy of the Plans.
c. Penzel presented sufficient evidence to show that the Plans were "defective" within the meaning of Spearin
The District argues that even if Manzi and Bernard qualify as "experts" and their opinions have proper foundations, their testimony was insufficient to prove that the Plans were defective under the meaning of Spearin . We disagree. As previously noted, Manzi and Bernard were qualified to testify that the Plans were defective. Moreover, Penzel also provided testimony from lay witnesses who described why the Plans were deficient and the degree of difficulty involved with correcting the Plans' defects. Accordingly, Penzel presented sufficient evidence for a reasonable trier of fact to conclude the Plans were defective within the meaning of Spearin .
First, we will address the degree of defectiveness required to prevail in a Spearin claim. The District suggests that we adopt a government-owner friendly standard, such as the one applied in Dugan & Meyers Constr. Co. v. Ohio Dep't of Adm. Servs. , 162 Ohio App.3d 491, 502, 834 N.E.2d 1 (Ohio App. 2005). In Dugan , the Court of Appeals of Ohio required the plaintiff-contractor to show that the plans furnished by the defendant-owner were so defective that the project became "unbuildable or otherwise wholly inadequate to accomplish the purpose of the contract." Id. Although there are no Missouri cases that address the use of Spearin claims in our State, the spirit of the standard articulated in Dugan appears inconsistent with principles established by Missouri courts. In Sanders Co. Plumbing & Heating Inc. v. City of Indep. , the Western District found that "common sense" dictates that a contractor should not be penalized for doing exactly what he "was required to do under another's plans," explaining that a contractor should not be held responsible for the consequences of another's deficient plans. 694 S.W.2d 841, 848 (Mo. App. W.D. 1985) (citing Spearin , 248 U.S. at 136-37, 39 S.Ct. 59 ).
Effectively, the Spearin Doctrine places the risk of loss stemming from defective plans and specifications on the owner who renders the plans to the contractor. See Travelers Indem. Co. v. S.M. Wilson & Co. , No. 4:04 CV 01365 ERW, 2005 WL 2234582, at *10-11 (E.D. Mo. Sept. 14, 2005). This is equitable. The owner in a construction contract is better positioned to assess the accuracy and adequacy of the project's plans and specifications; therefore, it is better positioned to prevent losses from ever occurring. See PUBLISHER'S EDITORIAL STAFF, CONSTRUCTION CONTRACTS DESKBOOK , § 16:2 (2016). Owners typically have unrestricted access to the construction site, and they communicate directly with their own subcontractors who create the designs for a project. Id. Shifting the burden to ensure the adequacy of the plans and specifications to the general contractor would also have a negative economic impact. Encumbering general contractors with the responsibility of verifying the *232 accuracy and suitability of the plans would often cause needless delay due to the duplicative nature of the work. Id. General contractors would presumably incur more costs, in turn increasing costs for the government owners in the grand majority of cases, as the contractors would likely need to employ their own engineers and/or architects to reliably review the proposed plans. Even contractors who have their bids rejected would incur costs, as they would need to have the proposed plans examined before submitting a sensible bid. Placing the burden on contractors to ensure the adequacy of an owner's plans would reduce the efficiency of the industry, which is especially damaging to societal interests when government owners inevitably fund a portion of these increased costs. Furthermore, to hold a contractor or subcontractor liable for performing work in the exact manner agreed upon, while offering the faulting party a reprieve, is incongruent with contract principles and general notions of fairness.[6]
Assuming Penzel could establish the District actually furnished deficient plans and specifications, we are aware that the most blameworthy parties may be the architect of the Project (WNB) or the subcontractor who produced electrical plans and specifications for the Project (Henthorn). As neither Total Electric nor Penzel is in privity with either of these parties, only the District would have the opportunity to prevail on a legal claim against the party truly at fault. Captiva Lake Investments, LLC v. Ameristructure, Inc. , 436 S.W.3d 619, 628 (Mo. App. E.D. 2014) (explaining that there is no privity between a project owner and subcontractor when the owner's general contractor enters into a subcontract to which the owner is a non-party). Thus, the only way to place the parties in an equitable position would be to allow Penzel-on Total Electric's behalf-to bring a claim against the District, which may then attempt to recover from its own subcontractor(s) if either is responsible for the Plans' deficiencies and Total Electric's damages. In fact, the District has already taken this preventive measure by filing a third-party petition against Henthorn and WNB. Accordingly, we believe Missouri principles would be upheld by permitting contractors and subcontractors to bring Spearin claims in our State.
Penzel has presented sufficient evidence for a reasonable trier-of-fact to conclude the District's plans were defective for purposes of bringing a Spearin claim. As aforementioned, Manzi and Bernard both qualify as "experts" under § 490.065. Bernard testified in his deposition that the District "did not present a complete, thorough picture of what was required... There were omissions in the documents that prevented the scope [of the Project] to be fully supplied and given to the contractor with which to make an estimate."
Penzel also adduced deposition testimony from witnesses with personal knowledge and significant involvement in the Project. These lay witnesses attested to the volume and magnitude of the Plans' deficiencies. Phil Penzel, Penzel's president, corroborated Bernard's testimony. He testified that some of the specifications *233 called for components that "didn't exist anymore." Phil Penzel also stated that "[t]here were numerous things left out of the electrical drawings," which required Total Electric to purchase additional items not reflected in the Plans. These new items created additional costs for Total Electric which it was unaware of at the time of the bid, and therefore these costs were not contemplated by Total Electric during its formulation of the bid on the electrical work.
Danny Miller, a principal of Total Electric and an operations manager, also explained why the Plans were inadequate. He testified that the Plans would call for incompatible parts, which would require multiple installations. He also added that tracking down the correct parts would be a tedious process due to slow response times from the District. Danny Miller explained that remedying situations where the wrong part was listed in the Plans would often increase labor installation costs by two to three times the expected amount.
Among other evidence, Penzel also proffered an e-mail in which WNB acknowledged that "the fact that the Drawings are not correct and are inconsistent causes a real problem." Respondents would have every chance to rebut this evidence or question its credibility at trial; however, Penzel has presented sufficient evidence for a reasonable trier of fact to find that the Plans were deficient and caused damages.
4. Conclusion to Point I
The record reflects Penzel has satisfied its burden under Rule 74.04 to create a genuine dispute as to the material fact of whether the Plans were defective under the meaning of Spearin , thereby breaching its implied warranty to Penzel that the Plans were adequate. The testimony of Manzi and Bernard meets the requirements of admissibility under § 490.065. Moreover, Penzel adduced admissible non-expert testimony from lay witnesses with personal knowledge about the Plans. The testimony proffered by Penzel provides a basis for a reasonable jury to conclude the Plans were defective, thus creating a genuine dispute about the Plans' suitability. Point granted.
C. Point II-Damages and the Use of the Total Cost Method and Modified Total Cost Method
In Penzel's second point on appeal, it argues that it provided sufficient evidence to establish damages with "reasonable certainty." In addition to making a prima facie case that a contract existed and the contract was breached resulting in damages, a plaintiff must provide an adequate basis for a jury to calculate damages with reasonable certainty . See Midwest Coal, LLC ex rel. Stanton v. Cabanas , 378 S.W.3d 367, 371 (Mo. App. E.D. 2012) (citing Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc. , 155 S.W.3d 50, 54-55 (Mo. banc 2005) ). A plaintiff's evidentiary burden is easier to satisfy when his losses are directly traceable to the alleged breach (or directly traceable to each alleged defect in this case). However, Penzel alleged the Plans had "numerous instances of defects," and the "sheer volume and variety of interfering and disruptive causal events" made it impossible to precisely track and allocate "the [electrical labor] hours attributable to delay or disruption." Regardless of Penzel's difficulty tracking the alleged additional costs caused by the alleged breach, it must provide a means of calculating and proving those damages with reasonable certainty to obtain any recovery.
Penzel proposes we allow some of the alleged damages to be calculated using either (1) the total cost method ("TCM") or (2) the modified total cost *234 method ("modified TCM"). This is an issue of first impression in Missouri, as no reported Missouri case has expressly accepted or rejected either approach. Accordingly, we will examine similar cases from other state courts and federal courts for guidance. Schembre v. Mid-Am. Transplant Ass'n , 135 S.W.3d 527, 531 (Mo. App. E.D. 2004) ("As a case of first impression, it is instructive to examine cases from other jurisdictions in addressing these issues."). Although out-of-state trial court decisions are neither persuasive nor binding on this Court, appellate court decisions from other states can be persuasive when they are based on similar facts and "sound principles and good reason." Craft v. Philip Morris Companies, Inc. , 190 S.W.3d 368, 380 (Mo. App. E.D. 2005) (quoting Mo. Tp. Chariton County v. Farmers' Bank , 328 Mo. 868, 42 S.W.2d 353, 356 (1931) ). Additionally, although not binding, federal cases can be highly persuasive.[7] Buemi v. Kerckhoff , 359 S.W.3d 16, 22 (Mo. banc 2011). Nonetheless, whether we accept the use of either method hinges on each method's coherence with well-established Missouri contract law principles.
This raises two especially significant questions: (1) would our State's goal to put the non-breaching party in the position he would be in absent the breach be promoted or undermined by allowing the use of either method? and (2) does either method comport with Missouri's well-established requirement to prove the amount of damages with reasonable certainty? See Ideker , 654 S.W.2d at 617 ; see also Ameristar Jet Charter , 155 S.W.3d at 54-55. To answer these questions, we will first examine both methods; then we will discuss whether either conforms to the principles of contract law in Missouri.
1. Introduction to the Total Cost Method and Modified Total Cost Method
The TCM allows a contractor to calculate his damages by subtracting his amount bid (or the "contract price") from the total cost he incurred to fulfill its contractual obligations. Sunshine Constr. & Eng'g, Inc. v. United States , 64 Fed.Cl. 346, 371 (2005). This approach presumes that the breaching party is the sole and exclusive cause of the non-breaching party's damages, even though the additional costs incurred by the contractor could have actually been caused or contributed to by a myriad of factors. See Cavalier Clothes, Inc. v. United States , 51 Fed.Cl. 399, 417-18 (2001). Effectively, the TCM is an all-or-nothing approach, and on some occasions it would allow a plaintiff to recover damages-even damages he is partially at fault for causing-beyond what was anticipated when the parties entered into the contract. See id. For example, if a contractor bid $1,000,000 and incurred a total cost of performance of $1,500,000, he would either recover $0 (if the fact-finder concludes no breach occurred) or the full $500,000 difference between the actual cost and bid amount using the traditional TCM, regardless of his level of culpability.
The modified total cost approach primarily operates in the same manner as the total cost method. However, whereas the calculation under the TCM is the end *235 point under that approach, the calculation is merely a starting point under the modified TCM, which can then be reduced by any additional costs attributable to the plaintiff's own errors. Dillingham-Ray Wilson v. City of Los Angeles , 182 Cal.App.4th 1396, 1408, 106 Cal.Rptr.3d 691 (2010) (citing Servidone Const. Corp, 931 F.2d at 862 ). Accordingly, the modified TCM allows the fact-finder to calculate damages in a way that more fairly represents the damages actually caused by the defendant-owner. Using the same prior example, to the extent a plaintiff-contractor can prove the defendant-owner caused his additional costs, he could recover any amount of damages between $0 and $500,000.
2. Missouri Policy on Contract Damages
"Generally in breach of contract cases, our goal is to award plaintiffs a sum that would put them in the same position as if defendant had fulfilled his obligations under the contract[.]" Dubinsky v. U.S. Elevator Corp. , 22 S.W.3d 747, 752 (Mo. App. E.D. 2000). However, we do not endeavor to place the non-breaching party in a better position than he would be in absent the breach. Id. It is clear that the modified TCM is more aligned with our State's contract law policy than the TCM. In some cases, employing the TCM would result in the plaintiff being in a better position than he would have been if both parties had performed as anticipated. As a necessary corollary, it follows that the defendant would be penalized for damages he did not cause in some cases, even those which flow directly from the plaintiff's error.
The goal of the modified TCM and the goal of Missouri contract law are consistent: both seek to place the non-breaching party in the same position he would be in absent the breach, while only penalizing the breaching party to the extent he is responsible for the non-breaching party's damages. See id ;see also Gateway Foam Insulators, Inc. v. Jokerst Paving & Contracting, Inc. , 279 S.W.3d 179, 184 (Mo. banc 2009) (quoting Ameristar Jet Charter , 155 S.W.3d at 54 ) ("The goal of awarding damages is to compensate a party for a legally recognized loss...and a party should be fully compensated for its loss, but not recover a windfall."); see also Servidone Const. Corp. v. United States , 931 F.2d 860, 862 (Fed. Cir. 1991) (explaining the modified TCM allows for adjustments to calculate an amount that fairly represents "the increased costs the contractor directly suffered from the particular action of [the] defendant which was the subject of the complaint"); see also Cavalier Clothes , 51 Fed.Cl. at 417-18.
3. The Reasonable Certainty Requirement
Although the modified TCM theoretically harmonizes with Missouri contract law, it should only be used as a framework for calculating damages if the plaintiff can present sufficient evidence to prove the damages with reasonable certainty under the method. See Ameristar Jet Charter , 155 S.W.3d at 54-55. Similar to the calculation of "lost profits damages," calculating damages under the modified TCM involves the use of estimated figures. Id. at 55 ("In general, in calculating lost profits damages, lost revenue is estimated, and overhead expenses tied to the production of that income are deducted from the estimated lost revenue."). Using estimated numbers, as opposed to precise, actual figures, inherently reduces the certainty with which a fact-finder can calculate damages. In our case, Penzel has clearly presented sufficient evidence for a reasonable fact-finder to conclude that the District's deficient *236 plans caused some damages. The primary question we must address is whether there is sufficient evidence to establish, with reasonable certainty, the amount of damages.
We should note "the modern emphasis on the requirement that damages be shown with certainty is on the fact of damages and not on the particularized amount." Gasser v. John Knox Village , 761 S.W.2d 728, 731 (Mo. App. W.D. 1988) ("Uncertainty as to the amount of profits that would have been made does not prevent a recovery."). Once the fact of damages has been established, we require a lesser degree of certainty as to the amount of damages, and we allow the jury to exercise a greater degree of discretion in assessing that amount. Id. ; BMK Corp. v. Clayton Corp. , 226 S.W.3d 179, 196 (Mo. App. E.D. 2007). Moreover, "[i]f the evidence in a case...demonstrates that a party had a substantial pecuniary loss, but it is apparent that the loss is of character which defies exact proof, a lesser degree of certainty as to the amount of the loss is required, leaving a greater degree of discretion to the finder of fact as to the amount of damages to be awarded." Am. Eagle Waste Indus. , 463 S.W.3d at 20 (citing Ameristar Jet Charter , 155 S.W.3d at 54-55 ). Although the amount of damages is a question of fact for the jury to resolve, "[t]he proper measure of damages is a question of law, which we review de novo ." 66, Inc. v. Crestwood Commons Redevelopment Corp. , 130 S.W.3d 573, 584 (Mo. App. E.D. 2003). Before the jury can address these questions of fact, the plaintiff bears the burden of presenting "competent and substantial evidence" to establish an adequate basis for calculating a rational estimate of damages. Best Buy Builders, Inc. v. Siegel , 409 S.W.3d 562, 565 (Mo. App. E.D. 2013).
4. The Total Cost Method
There is much more extensive case law discussing the TCM than the modified TCM, but given the high degree of similarity, it can provide guidance in our reasonable certainty analysis. Courts understand the inherent uncertainty in using the TCM; consequently, courts often require plaintiff-contractors to satisfy a four-prong test that helps ensure reliability before allowing recovery under the TCM. Cavalier Clothes , 51 Fed.Cl. at 418 (citing WRB Corp. v. United States , 183 Ct.Cl. 409, 426 (1968) ). "Thus, if plaintiff cannot prove all of the elements, or, conversely, if the defendant can disprove at least one of them, the court will deny recovery under the total cost method." Id. These four prongs of reliability are: "(1) the nature of the particular losses make it impossible or highly impractical to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs are reasonable; and (4) it was not responsible for the added expenses." Id. (quoting WRB Corp. , 183 Ct.Cl. at 426 ). These four requirements must be proven by a preponderance of the evidence under the traditional TCM analysis. Id. Failure by a plaintiff to satisfy any of these four elements is fatal to her breach of contract claim when seeking recovery of damages under the traditional TCM. Id.
5. The Modified Total Cost Method
Compared to the rigid all-or-nothing approach of the TCM, the modified TCM is more nuanced. The modified TCM offers flexibility by allowing for adjustments to the total calculation of damages under the total cost method. Id. Under the modified total cost method, the four-prong test articulated above is still used; however, it is merely a starting point, subject to adjustments to help "convince the court that the ultimate, reduced, *237 figure fairly represented the increased costs [the plaintiff] directly suffered from [the breach]." Id. (internal quotations omitted). The first prong-proving actual losses is either impossible or highly impractical through a more direct means-still acts as a prerequisite for the plaintiff in many courts, as it is an either/or proposition that does not allow for adjustments. Id. ; Youngdale & Sons Const. Co. v. United States , 27 Fed.Cl. 516, 541 (1993) ("[T]he total cost method is only utilized in extreme cases where it is difficult or impossible to identify specific increases in costs with the actions of the defendant."). The latter three prongs, however, concern numerical values and monetary amounts which accommodate adjustments. Plaintiffs are generally required to establish that proving actual losses is impossible or highly impractical, as the TCM and modified TCM are "disfavored by the courts" and generally considered "theor[ies] of last resort." Cavalier Clothes, 51 Fed.Cl. at 417 (quoting Youngdale & Sons Constr. Co. , 27 Fed.Cl. at 540 ). Accordingly, courts use these approaches judiciously.
Although both approaches have some flaws, the modified TCM helps solve some of the inherent problems of the traditional TCM that can lead to skewed and inequitable damages calculations. Servidone Const. Corp , 931 F.2d at 862. For example, the original contract price, which is equal to the contractor's submitted bid, presumes that the bid was "reasonable." Id. at 861-62. Accordingly, if the contractor made a low bid that would have resulted in a net loss for him even without the breach, he would be placed in a better position under the TCM if his suit was successful, which would allow him to break even on the transaction. Similarly, the TCM presumes the contractor was not responsible for any increase to the total cost of performing the contract. See id. ; see also Cavalier Clothes , 51 Fed.Cl. at 418. This creates a windfall for a plaintiff who contributes to his own added costs, such as working inefficiently. See Servidone Const. Corp , 931 F.2d at 862.
Unlike the TCM, the modified TCM allows for adjustments to (1) the original contract price (the amount of the contractor's accepted bid), (2) the total cost of performance, or (3) both. See id. ; see also Cavalier Clothes , 51 Fed.Cl. at 418. Accordingly, the calculations can be tailored to more accurately reflect the amount of damages caused by the breaching party's errors, helping place both parties in their rightful positions. See Cavalier Clothes , 51 Fed.Cl. at 418. This is precisely our State's goal when awarding damages in breach of contract actions. See Dubinsky , 22 S.W.3d at 752. At the same time, we are aware of the dangers of both total cost approaches and why many courts disfavor them. Cavalier Clothes , 51 Fed.Cl. at 417-18. Whether courts allow the TCM or modified TCM depends on questions of fact. See Servidone Const. Corp. , 931 F.2d at 862 (explaining the trial court assessed the reasonableness of the contractor's bid and his total actual costs).[8] The TCM is incompatible with Missouri contract law and should be avoided. Regarding the modified TCM, we merely conclude its framework-or a similar framework-should not be prohibited in Missouri as a matter of law.[9] As with any other breach *238 of contract case, the crux of the matter remains whether the plaintiff can present sufficient evidence for a jury to calculate an amount of damages with reasonable certainty. The modified TCM simply provides a blueprint for a plaintiff to potentially satisfy this requirement, the applicability of which will hinge on (1) the sufficiency of evidence the plaintiff presents, which is determined by the court; and (2) the specific facts of a case, which is determined by the fact-finder.
6. An Example of Applying the TCM and Modified TCM to the Same Situation
Here is a relatively simple example of calculating damages under the TCM and the modified TCM. Once again, assume a project would generally cost a plaintiff-contractor $1,500,000 without a breach in the contract, and due to the non-breaching plaintiff-contractor's bidding error, he made a $1,000,000 bid that the owner accepted. Absent a breach, the plaintiff-contractor would anticipate a $500,000 loss, and the defendant-owner would expect to pay $1,000,000 for the contractor's performance. Additionally, assume the defendant-owner provided deficient plans and specifications to the plaintiff-contractor that contributed to an additional $300,000 for the contractor, creating a total cost of $1,800,000 to complete the project.
In this scenario, before obtaining any legal recovery, the plaintiff-contractor would have an $800,000 loss on the transaction ($1,800,000 actual costs minus $1,000,000 bid), $500,000 of which was caused by his own fault for underbidding and $300,000 of which the defendant-owner caused by furnishing deficient plans. Consequently, the plaintiff-contractor would actually be placed in the position he bargained for by receiving $1,300,000 from the defendant-owner (the initially agreed upon price of $1,000,000 plus $300,000 for additional costs the defendant-owner is at fault for creating), resulting in a net loss of $500,000 for performing under the contract. Naturally, the breaching defendant-owner would also be placed in his rightful position by paying $1,300,000 to the plaintiff-contractor for his performance under the contract.
Accordingly, to place each party in his proper position, we would want to calculate damages using an approach that would result in the defendant-owner being liable to the plaintiff-contractor for $300,000 in damages (in addition to the $1,000,000 agreed to upon acceptance of the plaintiff-contractor's bid). The modified TCM would yield this exact result. However, in a successful Spearin claim where damages are calculated using the traditional TCM, the breaching defendant-owner would be penalized an extra $500,000 stemming solely from the plaintiff-contractor's bidding error, in turn creating a $500,000 windfall for the plaintiff-contractor. This example illustrates why the modified TCM is far more aligned with Missouri contract principles.
7. Applying the Four-Factor Test of the Modified Total Cost Method and Reasonable Certainty
As discussed infra in Sec. III(D), the four-factor test allows the plaintiff to establish a causal connection between the breach and his additional expenses, in circumstances in which it is impossible or impractical to allocate a cost to each defect, and (1) the plaintiff's bid is reasonable; (2) the additional costs to complete the project are reasonable; and (3) the *239 owner is solely at fault for the damages. Once these three elements are established, it naturally follows that the plaintiff's damages will be accurately represented by subtracting the bid price from the total cost of the project. Moreover, to the extent the plaintiff fails to show all of these factors, the total damages can be adjusted downward to reach an equitable amount. Accordingly, we believe the modified total cost method can be used to calculate damages in Spearin claims, but only when it adheres to Missouri's reasonable certainty requirement, which is contingent on the facts of the particular case.
As an appellate court reviewing the grant of summary judgment in favor of the defendant, we will only consider whether there is sufficient evidence to create a genuine dispute as to the existence of a material fact; "[t]he propriety of summary judgment is purely an issue of law," not fact. See ITT , 854 S.W.2d at 382. We also accord Penzel, as the non-movant, "the benefit of all reasonable inferences from the record." Id. at 376. In the next section we will examine how other jurisdictions have applied the four-factor test, assess its conformity with Missouri precedent, and determine whether Penzel has proffered competent and substantial evidence to establish the amount of damages sought with reasonable certainty.
D. Point III-The Four-Factor Test
Penzel contends that the trial court erred in granting summary judgment because it presented competent evidence to satisfy the four-factor test and Missouri's reasonable certainty requirement, thereby creating a genuine issue of material fact and making summary judgment inappropriate. In assessing the sufficiency of a plaintiff's evidence to prove damages with reasonable certainty and the viability of the modified TCM, courts generally examine four factors: "(1) the nature of the particular losses make it impossible or highly impractical to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs are reasonable; and (4) it was not responsible for the added expenses." Cavalier Clothes , 51 Fed.Cl. at 418.
1. First Factor: The Impracticality or Impossibility of Proving Actual Losses Directly
For a plaintiff to satisfy the first factor (which many courts consider a requirement as discussed supra in Sec. III(C)(5)), generally, he must present proof that no other feasible means for calculating damages exists. See Moorhead Const. Co. v. City of Grand Forks , 508 F.2d 1008, 1016 (8th Cir. 1975). Courts generally enforce this requirement to ensure the modified TCM is not used in lieu of a more precise measurement. See Cavalier Clothes , 51 Fed.Cl. at 419. Consistent with their desire for precise and accurate damages calculations, many courts do not believe a plaintiff-contractor should be able to enjoy the benefits of the TCM or modified TCM if tracking the damages directly attributable to the breach was possible but he failed to do so. Id.
For example, in Cavalier Clothes , the trial court found that it "appear[ed] impossible for [the plaintiff] to prove the amount of its actual losses directly with reasonable accuracy[.]" Id. Nonetheless, the court barred the plaintiff from using the TCM or the modified TCM to prove damages, finding the impossibility of proving damages occurred "simply because [the plaintiff] failed to maintain its records," not due to "the fleeting or ephemeral nature of those losses." Id. The court reasoned that because these methods are "highly disfavored" it was "disinclined to allow a plaintiff to rely on [these methods] based on a *240 bed of its own making." Id. The court also noted that a plaintiff's failure to produce reasonably accurate cost records are only excused when it was unable to do so for reasons "beyond the control of the [plaintiff] contractor." Id. at 419-20.
Although Missouri requires plaintiffs to prove their amount of damages with "reasonable certainty," the degree of certainty required to meet this standard is balanced against our State's goal to place the parties in an equitable position. This may be most apparent in cases involving lost profit damages. For example, in Ameristar Jet Charter , the Supreme Court of Missouri noted:
In some cases, the evidence weighed in common experience demonstrates that a substantial pecuniary loss has occurred, but at the same time it is apparent that the loss is of a character which defies exact proof. In that situation, it is reasonable to require a lesser degree of certainty as to the amount of loss, leaving a greater degree of discretion to the court or jury. This principle is applicable in the case of proof of lost profits.
155 S.W.3d at 55. This is especially true in construction contracts claims when attempting to account for productivity losses caused by delays.
One of the ironic things about loss of productivity claims is that often the very factors that produce the loss of productivity can also serve to preclude the accurate and precise record-keeping that would constitute evidentiary certitude. The disruptions, impacts, need for acceleration, lack of information or decisions by the government and the schedule disruptions make it more difficult to track the specific causes and effects of the situation. These factors necessitate increased management attention to getting the work performed and increase disorganization of the contract work... [g]enerally, accounting and project records do not isolate the costs for productivity losses separately from the other costs of the project because the work affected by the loss of productivity is intregal with the base contract work. There is no precise way to separate the normal or base work that is performed by an employee from the inefficient portion of the work... the base work and the inefficiency component are intertwined to an extent that prohibits a clear delineation between them.
Thomas E. Shea, Proving Productivity Losses in Government Contracts , 18 Pub. Contract L.J. 414 (1989).
In the instant case, Penzel contends that tracking its damages was impossible, or at least impractical, because of the pervasive nature of the defects and the District's untimely responses to address problems with the Plans. Penzel claims the Plans were defective in a number of material ways, including (1) the inadequate low voltage switching and wiring design affecting the gymnasium and some student areas; (2) the incorrect kitchen drawings; (3) the failure of the plans and specifications to call for emergency ballasts; (4) incorporating a defective gymnasium lighting design; (5) the failure to depict all the water heaters and circulating pumps requiring wiring; (6) specifications calling for outdated products; (7) non-compliance with building codes; and (8) an incorrect depiction of some site electrical work as work to be performed by others.
In his deposition, Penzel's expert witness Manzi conceded that tracking costs may not have been impossible, but he opined that it would not have been "reasonable or possible" to do so without "an incredible cost controlled group of people on-site, almost doing [a] time study." Manzi explained why matching each cost and *241 defect would be extremely difficult in a report he created:
Cumulative impact costs are those costs attributed to the compound, disruptive effect of multiple changes and problems. Cumulative impact costs are often not directly associated with the events and issues that gave rise to the original change. Due to the complexity and cumulative impacts, the costs are not readily subject to collection utilizing standard cost accounting methods and are not readily subject to evaluation or computation in the same fashion as normal change order work. In fact, it would be extremely difficult to itemize and account for the cost of each disruptive impact given the fact that the impacts were so numerous and cumulative in nature.
Manzi's testimony provides evidence that the damages Total Electric allegedly suffered are "of character which defies exact proof." See Ameristar Jet Charter , 155 S.W.3d at 54-55. Manzi testified that the defects in the Plans were "numerous" and "cumulative," thus making it nearly impossible for Total Electric to track and precisely allocate the costs related to the alleged defects without incurring substantial additional costs. Accordingly, we are more inclined to afford greater discretion to a jury in determining a plaintiff's damages. See id.
2. Second Factor: The Reasonableness of the Contractor's Bid
The second factor in assessing the viability of using the modified TCM is determining whether a plaintiff-contractor can prove, by a preponderance of the evidence, that the bid he made was reasonable. Cavalier Clothes , 51 Fed.Cl. at 418, 421. This factor helps prevent a plaintiff-contractor from receiving a benefit for his failure to accurately project the level of difficulty and amount of cost associated with performing the contract. Id. Simply presuming that a plaintiff-contractor's bid is reasonable, when he actually erred and underbid, gives him the benefit of increased damages, as using this lower bid inflates the difference between his bid and his actual cost of performance. Id. The reasonableness of the bid is viewed objectively through the lens of a "reasonable contractor." Id. Thus, whether the plaintiff-contractor underbid or made a reasonable bid on the project depends on the cost a "reasonable contractor should have expected" at the time he submitted the bid. Id. (internal quotations omitted).
The typical starting point for analyzing the bid's reasonableness is examining the bids of other contractors for the same project. Id. The bid in question here is Total Electric's bid on the electrical work for the Project. In addition to Total Electric's bid, the District received two other bids for the electrical work. However, the two other bids included a broader scope of work. These two bids were based on the same electrical work Total Electric bid on, but also included work on the District's fire alarm system and/or audio system. Total Electric submitted a bid of $1,040,444, the next lowest bid was $1,305,800, and the highest bid was $1,404,450. To make an "apples-to-apples" comparison to account for the extended scope of work factored into the two opposing bids, Penzel presented evidence in the form of expert witness testimony from Manzi. Manzi offered his opinion that the cost for the Fire Alarm System would be approximately $192,980 and installing the sound system would cost approximately $31,180 (for a total additional cost of $224,160). After "normalizing" the bids to account for the additional costs considered in the other two bids, Total Electric's adjusted bid totaled $1,264,604 (Total Electric's *242 original bid of $1,040,444 plus the additional costs estimated by Manzi of $224,160). Using the adjusted figures, Total Electric's bid was only 3.3% (or $41,196) lower than the next lowest bidder.
The District argues that Penzel's "sole evidence to establish [that Total Electric's bid was reasonable] is Mr. Manzi's conclusion 'Total Electric's bid was competitive and reasonable.' " This contention ignores the underlying premises for Manzi's conclusion. The proximity between Total Electric's adjusted bid and the next lowest bid (3.3%) supports Manzi's conclusion. See Neal & Co. v. United States , 36 Fed.Cl. 600, 639-40 (1996) (finding that the fact the contractor's price was only 4.07% lower than the next bid supported the bid's reasonableness). The District does not contest the reasonableness of the figures Manzi used to account for additional work factored into the two bids from Total Electric's competitors, nor does the District contest the next lowest bid itself was unreasonably low.
Moreover, using a rational process to formulate a bid helps support a finding that a bid is reasonable. Id. at 640. Total Electric explained it utilized computer software to estimate its bid, as well as historical numbers from previous projects the company had completed. Additionally, Danny Miller personally reviewed Total Electric's bid using his experience in the construction industry to confirm he found the bid reasonable. Total Electric presented evidence the bid was not arbitrarily calculated. The proximity of Total Electric's bid and the two other bids and the testimony explaining Total Electric's process for creating its bid both support that the bid was reasonable.
As previously noted, the District will have an opportunity to discredit Manzi's testimony or present its own evidence of the bid's unreasonableness at a trial; nonetheless, Penzel has presented sufficient evidence for a fact-finder to conclude Total Electric's bid was not unreasonably low. Moreover, even if the jury concludes Total Electric's bid was unreasonably low, it can reduce the damages calculation by the amount a "reasonable contractor's bid" would exceed Total Electric's bid. By allowing for the bid to be adjusted if the jury concludes the bid was low, it empowers the jury to calculate an award that accurately reflects the amount of damages it concludes Penzel actually suffered from the breach-the amount that the jury believes will place each party in the position they would have been in absent the breach.
In light of the evidence proffered by Penzel, we find it has presented sufficient evidence to support a jury's finding that Total Electric's bid on the Project's electrical work was reasonable. If the jury concludes Total Electric's bid was reasonable, it provides support for the conclusion that the total amount of its damages is equal to the total costs allocated to the Project, less the amount anticipated (plus any built-in profit margin) absent the breach. Such a finding would also help ensure the jury has an adequate basis to calculate damages with reasonable certainty.
3. Third Factor: The Reasonableness of the Contractor's Costs
The third factor in our modified TCM analysis focuses on the reasonableness of Total Electric's costs to fulfill its duties under the Subcontract. A plaintiff-contractor is required to provide "some reasonably accurate evidence of the various costs involved." E.C. Ernst, Inc. v. Koppers Co. , 626 F.2d 324, 328 (3d Cir. 1980). Total Electric produced testimony from several witnesses to support its contention that its total costs were reasonable. Rodney Miller, one of the principals of Total Electric, testified in his deposition *243 that he monitored the hours expended on the Project and he made a conscious, continual effort to withdraw workers from the Project as delays occurred. Moreover, although Total Electric did not allocate all of its expenses to specific deficiencies in the Plans or specific delays, Rodney Miller also testified that Total Electric monitored and kept contemporaneous records to track its total labor costs during the Project. Additionally, Rodney Miller testified that he monitored and coordinated the manhours needed to complete portions of the Project and tried to allocate them efficiently "usually weekly, monthly, or whenever there [was] a change in... the direction of the [P]roject or what tasks [they] were working on."
Total Electric also relied on Manzi's expert testimony to establish that its actual costs to complete the Project were reasonable. Manzi prepared a spreadsheet that calculated the sum of Total Electric's materials, labor, and other job expenses. The District's main argument against Manzi's conclusion is that the sum was based on total labor hours and cost of materials that were not separately allocated between (1) the cost associated with the original work under the Contract; and (2) the additional work caused by the District's alleged breach. Once again, evidence that would allow the District to separate these costs with more certainty is the same evidence that it argues is unavailable, which is the reason Penzel proposed using the modified TCM. Instead, if the fact-finder believes the bid was reasonable and the total cost calculated was reasonable, the amount of "additional costs" caused by the breach can easily be reverse-engineered by taking the difference between Total Electric's total cost and its bid, using the bid as a proxy for its costs allocated to the originally agreed upon work. The District will have the opportunity to contest the reasonableness of Total Electric's costs by presenting its own evidence and/or discrediting Penzel's witnesses. Nonetheless, Penzel has provided an adequate evidentiary basis for a fact-finder to measure the appropriate inputs in the modified TCM equation if it finds the District is liable for breach of contract. Looking strictly at the evidence adduced to support that Total Electric's actual costs were reasonable, we find Penzel provided sufficient evidence to find the actual costs reasonable.
4. Fourth Factor: The Contractor's Lack of Responsibility for the Additional Costs
The final factor examines whether the plaintiff-contractor bears some of the blame for the delays and the associated additional costs incurred. Penzel presented evidence through testimony that the Plans' deficiencies were the sole cause of its additional costs. Both Danny and Rodney Miller had personal knowledge of the Plans and Total Electric's work on the Project, and both testified about the numerous problems they encountered because of the Plans' inadequacies. See Sec. III(B)(3)(c) for discussion of Danny Miller's testimony; see Sec. III(D)(3) for discussion of Rodney Miller's testimony.
The District states "[t]he evidence presented in the underlying matter shows [Total Electric] contributed to the delays, and [Total Electric] failed to apportion the overages between [Total Electric and the District] as required under the total cost method." However, a reasonable finder of fact could disagree with the District's contention and find Total Electric faultless. Both of the Millers also testified to counter the District's assertion that some of the delays and inefficiency costs were attributable to other factors, the two primary causes being (1) damage to a building's roof that delayed performance between *244 January 2008 and June 2008, and (2) "inappropriate levels of manpower for certain trades, especially masonry." Danny and Rodney Miller testified that even though the masonry work specifically was delayed, it did not affect Total Electric's overall timeline because there were always ample areas Total Electric could have worked on if the Plans were adequate or the District had timely responded to Total Electric's inquiries to resolve the issues created by the Plans' deficiencies. Moreover, even if a fact-finder concludes Total Electric contributed to some of its delay damages, that finding alone will not preclude it from recovering a portion of its delay damages with reasonable certainty.
The fact-finder is in the best position to determine what factors caused delays and to what extent, especially when the evidence exclusively relies on witnesses' testimony where assessing credibility is crucial. See Neb. Pub. Power Dist. v. Austin Power, Inc. , 773 F.2d 960, 968 (8th Cir. 1985) ). Total Electric has presented sufficient evidence for a reasonable fact-finder to conclude it did not contribute to any additional costs in completing the Project, which supports its argument that the Plans' deficiencies caused all additional costs.
5. Conclusion to Point III
We find there is sufficient evidence for a reasonable jury to determine, with reasonable certainty, the fact of damages and the amount of damages. "[A]ny evidence in the record that presents a genuine dispute as to a material fact defeats the movant's prima facie showing [that he is entitled to judgment as a matter of law]." ITT , 854 S.W.2d at 382. After examining the rationale for using the modified TCM and how it has been applied in other courts, we find the method may be instructive and provide a possible avenue to establish damages. After reviewing the record in this case in the light most favorable to the party against whom summary judgment was entered, we find Penzel has presented sufficient evidence to provide a jury an "adequate basis" for calculating a rational estimate of damages. Binkley , 447 S.W.3d at 196 ; Best Buy Builders , 409 S.W.3d at 565.
E. Point IV-Prejudgment Interest under Missouri's Prompt Payment Act
Missouri's Prompt Payment Act under § 34.057[10] requires owners to make prompt payments to contractors, and contractors to make prompt payments to subcontractors, for their work on construction projects in "public works contracts." Generally, if a public owner fails to make prompt payments owed to the contractor in accordance with § 34.057, in addition to that unpaid amount, the contractor may be entitled to interest at the rate of one and one-half percent per month. §§ 34.057.5, 34.057.8. Similarly, a contractor in a public works contract generally owes the same duty of prompt payment to a subcontractor, and the subcontractor may be entitled to additional money calculated at an interest rate of one and one-half percent per month if the contractor fails to comply. §§ 34.057.6, 34.057.8. Nonetheless, interest under §§ 34.057.5 and 34.057.8 will only accrue if the withholding of the payments is not done in "good faith for reasonable cause."
We do not reach a conclusion on the merits of Penzel's prejudgment interest request in this case. For a plaintiff to be entitled to interest under the Prompt Payment Act, there must be an unpaid amount of money actually owed to the plaintiff, which is a determination properly made by the trial court on remand. See *245 KCRE, Inc. v. Robb , 897 S.W.2d 232, 234 (Mo. App. W.D. 1995) (holding that the prejudgment interest is a "matte[r] to be addressed by the trial court on remand," after reversing and remanding the trial court's grant of summary judgment in favor of the defendant). Moreover, embedded in the assessment of prejudgment interest are questions of fact which should be addressed by the fact-finder, such as whether the District acted in bad faith in withholding payments. Envtl. Prot., Inspection, and Consulting, Inc. v. City of Kan. City , 37 S.W.3d 360, 371 (Mo. App. W.D. 2000). Based on the trial court's conclusion that the District was entitled to judgment as a matter of law, it had no reason to assess the merits of Penzel's request for prejudgment interest. There was no amount of damages from which interest could accrue based on the trial court's judgment, rendering the issue moot. However, in light of our opinion today, the issue of prejudgment interest is no longer moot. We remand the issue of prejudgment interest to the trial court.
IV. Conclusion
After examining Spearin in relation to Missouri precedent, we find a Spearin claim is an acceptable vehicle for bringing a cause of action in Missouri. However, we reiterate that we only expressly adopt the use of Spearin when all of the following circumstances are present: (1) there is a dispute between a contractor (or subcontractor with a valid liquidating or "pass-through" agreement) and a governmental entity; (2) arising from a construction contract; (3) where the governmental entity furnishes inadequate or deficient plans and specifications for work to be performed by the contractor under the parties' agreement; and (4) these deficiencies cause additional costs for the contractor.
The label of "the modified TCM" is just that, a label. Our stance is simple: a plaintiff may meet his evidentiary burden for proving damages in a breach of contract case when he presents "competent and substantial evidence" to establish an adequate basis for calculating a rational estimate of damages. Best Buy Builders , 409 S.W.3d at 565. Additionally, we are cognizant that once the fact of damages has been established, we require a lesser degree of certainty to the amount of damages, and we allow the jury to exercise greater discretion in assessing that amount. Am. Eagle Waste Indus. , 463 S.W.3d at 20 (citing Ameristar Jet Charter , 155 S.W.3d at 54-55 ). Penzel has clearly presented sufficient evidence to establish the fact of damages. However, much like in cases involving lost profits, the "character" of Total Electric's damages defies exact proof, and if the jury concludes the District's defective plans and specifications caused damages to Total Electric, we should afford it greater discretion in determining the amount caused by that breach.
Penzel has presented evidence using multiple lay witnesses and expert witnesses to establish that the District breached the Contract, the breach resulted in damages, and that amount of damages can be calculated with reasonable certainty. We find this evidence sufficient for a reasonable jury to find Penzel established every element of a breach of contract claim (based on an implied warranty pursuant to Spearin ) and provide an "adequate basis" for a jury to calculate damages with reasonable certainty.
After reviewing the record, we find there exists a genuine dispute of material fact as to whether Penzel can prove the District breached its contract based on the Spearin Doctrine and establish damages with reasonable certainty. Penzel has adduced sufficient evidence for a reasonable *246 jury to find in its favor on this claim. Accordingly, the District was not entitled to summary judgment as a matter of law, and the trial court erred in granting the combined motions of the District, WNB, and Henthorn. Rule 74.04; ITT , 854 S.W.2d at 380.
For the foregoing reasons, we reverse and remand the trial court's judgment for further proceedings consistent with this opinion.
Sherri B. Sullivan, P.J., concurs.
Roy L. Richter, J., concurs.

On October 5, 2009, Penzel filed a petition against (1) the District, (2) Missouri United School Insurance Counsel ("MUSIC"), and (3) WNB. This petition included four counts. On July 21, 2010, Penzel filed its First Amended Petition, which included six counts. Three of the six counts were voluntarily dismissed by Penzel. Two counts against MUSIC have been addressed by the court; the trial court granted MUSIC's motion for summary judgment, and our Court affirmed it on appeal on March 25, 2014. Drury Co. v. Mo. United School Ins. Counsel , 455 S.W.3d 30, 40 (Mo. App. E.D. 2014) (Drury was a subcontractor of Penzel that worked on the Project). Accordingly, the only relevant petition in the analysis is the First Amended Petition, and the only remaining count before this Court is Penzel's breach of contract claim against the District.

In U.S. v. Spearin , the United States Supreme Court found that the government offered a warranty "implied by law" to the contractor that the plans it rendered to him would be adequate for him to perform the work bargained for in their contract. 248 U.S. 132, 136-38, 39 S.Ct. 59, 63 L.Ed. 166 (1918).

The third-party claims were for "negligence, contribution, and implied indemnity," seeking to hold Henthorn and WNB liable if the District was found liable in the action on appeal.

All references to Rules are to Missouri Supreme Court Rules (2015).

All statutory references are to RSMo 2000, unless indicated otherwise.

However, this does not mean the contractor does not have any obligations in every circumstance. For example, the United States Court of Federal Claims has imposed a "duty to inquire as to inconsistent specifications" and ambiguities if the plan includes "obvious or glaring defects." Metric Const. Co. v. United States , 80 Fed.Cl. 178, 186 (2008). Nonetheless, the court noted that latent inconsistencies and ambiguities in the government's plans do not trigger a duty to inquire for the contractor. Id. We will not examine if the alleged defects were "obvious and glaring" in the Plans, as Respondents did not raise this argument.

The only exception is unpublished district court opinions, which offer no persuasive value. Vill. at Deer Creek Homeowners Ass'n Inc. v. Mid-Continent Cas. Co. , 432 S.W.3d 231, 245 (Mo. App. W.D. 2014). However, the Supreme Court of Missouri has also concluded that unpublished federal cases can still be "instructive." Laut v. City of Arnold , 491 S.W.3d 191, 198 (Mo. banc 2016) ("While not precedential, the federal district court's unpublished decision in Wright v. City of Salisbury, Mo. , No. 2:07CV00056, 2010 WL 2947709, at *5-6 (E.D. Mo. July 22, 2010) is also instructive.").

In the Court of Federal Claims, from which Servidone was appealed from, civil cases that proceed on the merits do not provide jury trials, instead "a single judge" will be the sole finder of fact and decide the case. See 28 U.S.C. § 174(a).

Whenever there are no "equitable adjustments" to be made for the plaintiff's own errors, however, the calculation using the TCM or the modified TCM should reach the same result.

§ 34.057, RSMo Cum. Supp. 2014.