

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

ARLENE WICKHAM, )
)
Respondent, )
)
v. ) WD85170
)
JEAN HUMMEL, ) Order filed: December 27, 2022
)
Appellant. )

**APPEAL FROM THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI**
**THE HONORABE SHANE T. ALEXANDER, JUDGE**

Division One: W. Douglas Thomson, Presiding Judge,
Alok Ahuja, Judge and Edward R. Ardini, Jr., Judge

Jean Hummel ("Hummel") appeals from a judgment entered after a jury verdict awarding Arlene Wickham ("Wickham") $1,085,115 in damages. The jury found Hummel, a registered nurse, 100% at fault for injuries Wickham sustained following a left total knee replacement surgery performed by Dr. Steven Smith. Wickham ultimately underwent a below-the-knee amputation following her knee replacement surgery.

Hummel brings ten points on appeal. Points I, II, III, V, and VI argue that Wickham failed to make a submissible case on the element of causation in various

ways. Hummel's fourth and seventh points argue that Wickham also did not present a submissible case because she failed to present evidence that Hummel breached the standard of care. Points VIII, IX, and X all address damages. Finding no error, we affirm.

## Factual and Procedural History[1]

Wickham underwent left knee replacement surgery at North Kansas City Hospital on February 17, 2016. Dr. Smith performed the surgery, which concluded at 12:39 p.m. During surgery, Dr. Smith inadvertently cut Wickham's anterior tibial artery, which runs behind the knee joint. The bleeding caused by this cut went undetected and untreated for approximately two days. By the time it was discovered, Wickham required emergency surgery to repair the cut in an attempt to save the function of her leg. After ten months of extensive rehabilitation efforts, which were unable to restore full function to her leg, Wickham underwent a left below-the-knee amputation in December 2016.

After Wickham's February 17th surgery, Dr. Smith wrote various postoperative orders for Wickham's nurses. Notably in this case, Dr. Smith wrote an order that nurses were to perform neurovascular assessments every four hours for 24-hours following surgery.

At issue in this case is the care Nurse Jean Hummel provided Wickham on the day following surgery, February 18, 2016. Hummel was a nurse at North Kansas

---

[1] In an appeal from a denial of motions for directed verdict or JNOV, we view the evidence and all reasonable inferences in the light most favorable to the plaintiff. *See Coon v. Dryden*, 46 S.W.3d 81, 88-89 (Mo. App. W.D. 2001).

City Hospital who worked the day shift, 7:00 a.m. to 7:00 p.m., on February 18, 2016. As Wickham's bedside nurse, Hummel was the person primarily responsible for performing neurovascular assessments on Wickham.

Neurovascular assessments are designed to detect postoperative bleeding complications by assessing nerve and circulation functions around the operative site; in this case, Wickham's left knee. Neurovascular assessments evaluate five factors: (1) pain, because unexplained increases in pain sensations can indicate nerve compression from bleeding; (2) paralysis or other motor function compromise; (3) pulses to determine whether blood flow has been compromised; (4) pallor, because a pale skin appearance can indicate compromised blood flow; and (5) changes in skin temperature, which can also indicate compromised blood flow. Detecting bleeding complications after surgery is time sensitive; medical staff have a limited opportunity to intervene to prevent lasting damage to the patient.

Dr. Smith examined Wickham between 7:30 a.m. and 7:51 a.m. during his rounds on February 18 and found Wickham was "neurovascularly intact." Hummel performed her initial assessment on Wickham at 8:00 a.m. During her neurovascular assessment, Hummel assessed Wickham's dorsiflexion and plantar flexion, which test certain nerve function, as "poor." Hummel did not report Wickham's status to Dr. Smith.

Between 8:30 a.m. and 9:10 a.m., Wickham participated in physical therapy. The physical therapist noted Wickham was experiencing calf soreness, which is a

3

possible sign of a blood clot. The physical therapist reported Wickham's calf pain to Hummel. Calf pain is not expected after a total knee replacement.

In addition to the abnormal neurovascular assessments and calf pain, Wickham's reported pain increased throughout the morning. Wickham rated her pain as a "2" on a 10-point scale at 6:10 a.m., "9" at 8:28 a.m. and 11:38 a.m., and "10" at 12:18 p.m. Hummel did not notify Dr. Smith of Wickham's increased pain.

As a result of Wickham's reported calf pain, Hummel claims that she spoke with a receptionist from Dr. Smith's office for approval to get an ultrasound but did not speak with Dr. Smith directly. Dr. Smith denies having knowledge of any call from Hummel, and Hummel did not document the call in Wickham's chart. Despite Dr. Smith's lack of knowledge of the call, one of Dr. Smith's physician assistants, Lyndsey Ballou, accessed Wickham's chart, and shortly thereafter, an order for an ultrasound listing Dr. Smith as the ordering physician was entered for Wickham.

Pursuant to Dr. Smith's orders, Wickham should have received a neurovascular assessment around noon on February 18. Hummel did not document performing any neurovascular assessments in the morning after 8:00 a.m. throughout the afternoon. According to Hummel, she performed a neurovascular assessment on Wickham after she returned from physical therapy but did not document it.

Hummel was concerned about Wickham's condition throughout the day, and at 5:55 p.m., Hummel contacted the "STAT team" because Wickham had decreased urine output and had not voided during the entirety of Hummel's shift. A STAT team nurse, Nurse Fuller, responded to Hummel's page around 6:00 p.m. Fuller performed

4

a neurovascular assessment on Hummel and found that Wickham was experiencing increased pain and decreased sensation in her left foot. A patient's pulse should be felt, or located, at two points in the foot. Fuller could not feel or locate one pulse in Wickham's left foot and could detect the other left foot pulse only with a doppler ultrasound. Fuller contacted the working hospitalist, who told Fuller to make Dr. Smith aware of Wickham's condition. Hummel called Dr. Smith around 6:30 p.m., the first recorded time she contacted him all day. According to Dr. Smith, Hummel did not give him sufficient information about Wickham to alert him to a neurovascular problem with Wickham during this phone call. Hummel's shift ended at 7:00 p.m., and she left the hospital.

Other nurses contacted Dr. Smith about Wickham's condition during the night of February 18 and early morning on February 19. At around 11:47 p.m., the night shift nurse, Nurse Audus, contacted Dr. Smith's answering service to report Wickham had decreased pulses and sensation in her left foot. Dr. Smith spoke with Nurse Audus at 12:18 a.m. and told her to continue to monitor Wickham and to notify him with any change but did not make any new orders regarding Wickham's care. Notably, Hummel's charting on February 18 was so deficient that when she came in for her shift on February 19, her supervisor told her to get her charts up-to-date, meaning the February 18th overnight nurse did not have up-to-date charts from which to report to Dr. Smith.

At 6:56 a.m., another nurse contacted Dr. Smith and requested that he evaluate Wickham as soon as possible. Dr. Smith asked his physician's assistant,

5

Jennifer Batchelder, to evaluate Wickham. Batchelder examined Wickham and ordered lab testing on Wickham's left leg. Batchelder and Dr. Smith asked for a vascular surgeon to evaluate Wickham. The vascular surgeon performed emergency surgery on Wickham's left leg, which revealed that Dr. Smith had cut an artery during her total knee replacement and that Wickham had subsequently developed a hematoma in the space behind her knee.

**Procedural History**

Wickham filed her initial petition for damages in July 2016, prior to her amputation.[2] A jury trial began on August 9, 2021 against Hummel, Dr. Smith, and Dr. Smith's employer, Northland Bone & Joint, Inc. Wickham presented the testimony of Hummel and various experts, including a nurse expert, an orthopedic surgeon, a vascular surgeon, and a life care planner. Wickham also testified, along with her son, who is now her primary caregiver, and her sister.

At the close of Wickham's evidence, both Dr. Smith and Hummel filed motions for directed verdict, which the trial court denied. Dr. Smith and Northland Bone & Joint then presented their case, which included Dr. Smith's testimony, the reading of excerpts from Jennifer Batchelder's deposition, and the testimony of Dr. Smith's medical expert.

Hummel also presented evidence, which included the testimony of many medical professionals who were involved in Wickham's post-operative care. Hummel

---

[2] Ultimately, the trial commenced upon Wickham's seventh amended petition.

testified on her own behalf. Hummel also called several medical experts, including a vascular surgeon, a registered nurse, and a clinical nurse specialist.

Once Hummel rested her case-in-chief, both she and Dr. Smith made motions for directed verdicts at the close of all evidence, which the trial court denied.

Despite initially alleging eleven separate acts of negligence against Dr. Smith, Wickham submitted only one allegation of post-operative negligence to the jury.[3] Likewise, Wickham asserted nineteen allegations of negligence against Hummel, but submitted only two to the jury. The jury was instructed:

> In your verdict you must assess a percentage of fault to Defendant, Jean Hummel, R.N., if you believe:
> First, between the hours of 8:00 a.m. and approximately noon on February 18, 2016, the neurovascular of Plaintiff's left leg deteriorated, and
> Second, Defendant, Jean Hummel, R.N., either
>       failed to notify Steven Smith, M.D. of said deterioration, or
>       failed to perform proper neurovascular assessments of Plaintiff's left leg within that time frame, and
> Third, Defendant, Jean Hummel, R.N., in any one or more of the respects submitted in paragraph Second, was thereby negligent, and
> Fourth, such negligence directly caused or directly contributed to cause damage to Plaintiff.

The jury found Hummel 100% liable for Wickham's injuries, assessing no fault against Dr. Smith. The jury assessed Wickham's damages as follows:

Past economic damages:          $150,000

---

[3] Instruction 9 instructed the jury in Wickham's claim against Dr. Smith:
       In your verdict you must assess a percentage of fault to Defendant, Steven Smith, M.D. if you believe:
       First, Defendant Steven Smith, M.D. failed to properly perform a neurovascular assessment of Plaintiff's left leg at approximately 7:30 a.m. on February 18, 2016, and
       Second, Defendant Steven Smith, M.D. was thereby negligent, and
       Third, such negligence directly caused or directed contributed to cause damage to Plaintiff.

7

Future medical damages:         $492,541

Past non-economic damages:      $500,000

Future non-economic damages:    $800,000

In total, the jury awarded Wickham $1,942,541 in damages. The trial court reduced the jury's award for past and future non-economic damages pursuant to Section 538.210.2.[4] After the reduction, the total award was $1,085,115.

Pursuant to Section 538.220.2, Hummel requested future damages be paid in periodic or installment payments. The trial court granted the request in part, but required 73% of the future medical damages be paid in lump sum at the time of the judgment to offset a portion of Wickham's attorney's fees and costs.

Hummel filed a motion for judgment notwithstanding the verdict ("JNOV"), which the trial court denied. This appeal follows.

**Standard of Review**

We review a trial court's denial of Hummel's motion for directed verdict and JNOV under the same standard. *See Davolt v. Highland*, 119 S.W.3d 118, 123 (Mo. App. W.D. 2003). In reviewing both motions, we must determine whether the plaintiff made a submissible case. *Id.* "To make a submissible case in a medical malpractice action, the plaintiff must prove that the defendant failed to use the degree of skill and learning ordinarily used under the same or similar circumstances by members of the defendant's profession and that [her] negligent act or acts caused the plaintiff's

---

[4] All statutory citations are to RSMo 2016, as updated by supplement, unless otherwise indicated.

8

injury." *Coon v. Dryden*, 46 S.W.3d 81, 89 (Mo. App. W.D. 2001) (citing *Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611, 615 (Mo. banc 1995)).

We will not remove a case from the jury's hands "unless there is no room for reasonable minds to differ." *Id.* We "will reverse the jury's verdict for insufficient evidence only where there is a 'complete absence of probative fact' to support the jury's conclusion." *Id.* (quoting *Seitz v. Lemay Bank and Trust Co.*, 959 S.W.2d 458, 461 (Mo. banc 1998)).[5]

**Analysis**

Hummel brings ten points on appeal. Her points often overlap and build on each other, so we address them together when appropriate. For ease, we also address them out of order when necessary.

First, we address Hummel's points arguing that Wickham failed to make a submissible case that Hummel breached the standard of care on both Wickham's "failure to notify" claim (Point IV) and her "failure to properly assess" claim (Point VII).

Next, we discuss Hummel's arguments alleging that Wickham failed to make a submissible case as to causation. Hummel argues that Wickham could not make a submissible case against her because of Wickham's judicial admissions (Point I). Hummel also argues Wickham offered no evidence that earlier notification would have resulted in a different diagnosis or treatment (Point II). Similar to her second point, in Point V, Hummel argues that Wickham failed to make a submissible case

---

[5] Some of Hummel's points have separate applicable standards of review, and they will be referenced when applicable.

9

on causation because she did not submit evidence that an earlier notification would have resulted in a different diagnosis or treatment. Likewise, in Point VI, Hummel argues that Wickham offered no evidence that a "proper neurovascular assessment" would have resulted in a different diagnosis or treatment. Because Points II, V, and VI all address the submissibility of Wickham's case concerning causation, we address these points together. In the course of our discussion of these Points, we also address Hummel's Point III, which suggests that we should consider the submissibility of the case at the close of Wickham's evidence, even though Hummel thereafter chose to present evidence in her own defense.

Hummel's remaining points address damages. In Point VIII, Hummel argues that Wickham failed to present any evidence of the present value of her future medical damages as required by Section 538.215. In her ninth point, Hummel argues that the trial court erred in failing to instruct the jury to express future medical damages at present value. Finally, Hummel argues the trial court erred in ordering that 73.3% of future medical expenses be paid in a lump sum for attorney's fees and litigation expenses because such an order violates Section 538.220.

### Standard of Care (Points IV and VII)

Before addressing any of Hummel's claims, it is necessary to discuss the scope of the claims Wickham presented to the jury. The jury was instructed to assess a percentage of fault against Hummel if "between the hours of 8:00 a.m. and approximately noon on February 18, 2016, the neurovascular condition of Plaintiff's left leg deteriorated," and that during that time *either* Hummel "failed to notify" Dr.

10

Smith "of said deterioration, *or* failed to perform proper neurovascular assessments of [Wickham's] left leg within that time frame." (emphasis added). In other words, the jury was asked to examine Hummel's conduct during a four-hour period to determine if she *either* failed to inform Dr. Smith that Wickham was deteriorating *or* failed to perform a neurovascular assessment on Wickham. Therefore, when examining whether Wickham made a submissible case against Hummel, we examine only this time period and only Hummel's actions.

In Point IV, Hummel argues that the trial court erred in denying her motion for JNOV because Wickham failed to prove that Hummel breached the standard of care in Wickham's "failure to notify" claim. Similarly, in Point VII, Hummel argues that Wickham failed to establish that Hummel breached the standard of care in failing to properly assess Wickham.

Hummel cites very little law in support of her fourth or seventh points. In neither point does she define the required proof for a breach of the standard of care. In fact, both points focus on evidence that she claims conflicts with the jury's verdict. In her fourth point, Hummel focuses on the evidence against Dr. Smith, and whether he was aware of the ultrasound that was ordered under his name on the morning of February 18.[6] In her seventh point, Hummel points out that there was conflicting

---

[6] The jury heard conflicting evidence regarding how the order for the ultrasound came about. Hummel testified that she spoke with a receptionist from Dr. Smith's office regarding the ultrasound. An order for an ultrasound was later entered in Wickham's chart under Dr. Smith's name. Dr. Smith denied having knowledge of the ultrasound and denied ever authorizing an order. Based on the jury's verdict, it appears they did not believe Hummel's testimony regarding the ultrasound. As discussed below, we do not weigh evidence or resolve conflicted testimony, and we defer to the jury's factfinding.

testimony at trial on the standard of care for completing a "proper" neurovascular assessment.

Rather than challenge the submissibility of Wickham's case regarding a breach of the standard of care, Hummel is asking us to re-weigh the evidence and hold that the jury simply came to the wrong conclusion. Such an assessment is not our place. We do not have the authority to weigh the evidence, determine witness credibility, or resolve conflicting testimony after a jury verdict in a case. *See Ratcliff v. Sprint, Mo., Inc.*, 261 S.W.3d 534, 542 (Mo. App. W.D. 2008). We are concerned only with whether Wickham made a submissible case on all of her claims. As such, we are focused here on determining whether Wickham presented sufficient evidence that Hummel breached the standard of care to submit her claims against Hummel to the jury.

"To make a submissible case on [the issue of a breach of the standard of care], plaintiff was required to establish that [Hummel] failed to exercise that degree of skill and learning ordinarily exercised under the same or similar circumstances by members of [her] profession." *Delisi v. St. Lukes Episcopal-Presbyterian Hosp., Inc.*, 701 S.W.2d 170, 173 (Mo. App. E.D. 1985); *see also Mahoney v. Doerhoff Surgical Servs., Inc.*, 807 S.W.2d 503, 507 (Mo. banc 1991) ("[T]he allegations of negligence against the several health care provider defendants are of the kind that require the aid of expert medical testimony to prove the acceptable standard of professional care."). Generally, plaintiffs are required to provide expert testimony regarding the appropriate standard of care. *Delisi*, 701 S.W.2d at 173. Even without expert testimony, Missouri courts have held that a fact-finder may find that a nurse has

12

breached the standard of care where the nurse fails to follow a doctor's orders. *See, e.g.*, *Redel v. Capital Regional Med. Ctr.*, 165 S.W.3d 168, 172-73 (Mo. App. E.D. 2005) (holding that no expert testimony is needed when doctor ordered only one of patient's legs receive continuous passive motion ("CPM") therapy at a time and to monitor patient for disorientation, and nurse used two CPM machines at once, and did so when patient was disoriented causing permanent drop foot in patient); *Daugherty v. N. Kansas City Memorial Hosp.*, 570 S.W.2d 795, 797 (Mo. App. 1978) (holding that no expert testimony is necessary when nurse failed to follow doctor's orders to switch an ice pack from side to side of patient's throat every two hours, resulting in permanent and progressive Bell's Palsy to patient's face).

In this case, Wickham offered the testimony of a nurse expert, who testified that the appropriate standard of care is what a reasonably prudent and careful nurse would do in the same or similar circumstance. Wickham's nurse expert was critical of the care Hummel provided in several respects, including Hummel's lack of documentation and communication regarding Wickham's condition. Hummel herself admitted that she did not document many events concerning Wickham, which according to Wickham's nursing expert, was a breach of the standard of care. Hummel also admitted that she did not document performing a neurovascular exam on Wickham at noon, which Wickham's expert stated was also a breach of the standard of care.

Moreover, Wickham presented ample evidence that Hummel failed to follow both Dr. Smith's orders regarding Wickham's care and the hospital's policies. The

13

jury heard evidence that Hummel failed to perform or record a neurovascular assessment on Wickham between 8:00 a.m. and noon, despite Dr. Smith's order that nurses perform neurovascular assessments on Wickham every four hours for 24 hours following surgery. Further, Wickham admitted that she was concerned about Wickham's condition *throughout the morning* of February 18, and she failed to contact Dr. Smith, in violation of the hospital's policy that nurses immediately inform doctors of new or worsening symptoms.

With this evidence, Wickham presented a submissible case as to Hummel's breach of the standard of care in failing to notify and failing to properly assess. Wickham was required to put on expert testimony concerning how a nurse in the same or similar circumstance would behave and/or that a nurse failed to follow a doctor's orders. Wickham did both. Points IV and VII are denied.[7]

## Causation (Points I, II, III, V, and VI)

Next, we address whether Wickham made a submissible case as to causation. Ultimately, Hummel's arguments fail because they attempt to make this case about something it is not: Dr. Smith's conduct *after* twelve o'clock noon on February 18.

### Points II, V, and VI

Hummel's Points II, V, and VI all argue that Wickham failed to make a submissible case on the element of causation against Hummel. Similar to Point I, in

---

[7] In Point VII, Hummel also discusses the use of the word "proper" in Instruction No. 7, which instructed the jury to find against Hummel if they determined she failed to perform a "proper" neurovascular assessment. Hummel never argues that Instruction No. 7 was given to the jury in error. Instead, she argues that the testimony regarding what constituted a "proper" neurovascular assessment was conflicting. As we explained above, the jury is tasked with resolving conflicting facts, and we do not question their factfinding on appeal.

14

Point II, Hummel argues that Wickham failed to produce evidence that an earlier notification of Wickham's condition would have resulted in a different diagnosis or treatment and thus failed to prove that Hummel's conduct was the but-for cause of Wickham's injuries. Hummel contends that to prove her case, Wickham needed to call Dr. Smith to testify that he would have done something differently had Hummel contacted him between 8:00 a.m. and noon on February 18.[8]

Hummel admits that her fifth point is simply an expansion of her second point. In Point V, Hummel argues that Wickham's evidence as to causation was legally insufficient for four reasons. Hummel's first and third reasons are similar: both argue that Wickham relied on "self-contradictory" evidence, in that Wickham introduced expert testimony that Dr. Smith was negligent in failing to respond to notifications from nurses other than Hummel while Dr. Smith testified that he may have done something differently had Hummel informed him of Wickham's condition. Hummel's second reason concerns Wickham's supposed "judicial admissions," which we address below in Point I and will not address again. Hummel finally argues that Dr. Smith's

[8] In making the claims in her second point, Hummel relies on authority from other states, or on no authority at all. For example, in her brief, Hummel states, "Importantly, causation in a 'failure to notify' case cannot be based on expert opinion…when the plaintiff is suing that treater for breach of standard of care…" but cites to *no* legal authority from Missouri or any other jurisdiction to support her contention. Hummel also cites out-of-state authority to support her fifth point. Hummel argues that out-of-state authority should be considered here because such authority is "based on similar facts and 'sound principles and good reason.'" *Penzel Constr. Co. v. Jackson R-2 Sch. Dist.*, 544 S.W.3d 214, 234 (Mo. App. E.D. 2017) (quoting *Craft v. Philip Morris Companies, Inc.*, 190 S.W.3d 368, 380 (Mo. App. E.D. 2005)). We disagree that consideration of the law of other states is necessary in this case. Generally, out-of-state cases can be instructive when we are considering issues of first impression, which was the issue in *Penzel* and the cases cited by *Penzel*. *See Penzel Constr. Co.*, 544 S.W.3d at 234 (the court was considering "an issue of first impression in Missouri, as no reported Missouri case has expressly accepted or rejected either approach."). None of the issues Hummel presents to us are issues of first impression, and therefore we find it unnecessary and unpersuasive to consider the law of other jurisdictions. Our decision is guided by *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 862 (Mo. banc 1993), as discussed below.

testimony does not prove that he would have done something differently had Hummel notified him sooner of Wickham's medical condition.

Hummel's sixth point makes the same argument as her fifth, except Hummel addresses Wickham's "failure to properly assess" claim rather than her "failure to notify" claim. According to Hummel, both claims are "dependent on Dr. Smith being notified of the results of such assessment and acting on such information in a manner leading to a timely vascular surgery." Thus, we address them together.[9]

To make a submissible case for medical malpractice, Wickham must establish three elements: "(1) Proof that the act or omission failed to meet the requisite standard of medical care; (2) Proof that the act or omission was performed negligently; and (3) A casual connection between the act or omission and the claimed injury sustained by [Wickham]." *Delisi v. St. Luke's Episcopal-Presbyterian Hosp., Inc.*, 701 S.W.2d 170, 173 (Mo. App. E.D. 1985).

---

[9] In her third Point, Hummel contends that we should separately review the circuit court's denial of her motion for a directed verdict *at the close of Wickham's evidence*, even though Hummel (and Dr. Smith) thereafter presented evidence in their own defense. Hummel's argument is contrary to well-established Missouri caselaw, which we are bound to follow. As the Missouri Supreme Court has explained:

> At the close of plaintiff's evidence, Rule 72.01(a) provides defendant with the opportunity to challenge whether plaintiff has made a submissible case. If no further evidence is introduced, the case—both at trial and on appeal—is determined by the evidence on the record at that point. Should the trial court overrule the motion, defendant then has the choice of putting on evidence of his or her own. *If defendant introduces evidence, the state of the record at the close of plaintiff's case is waived and the case—both at trial and on appeal—is determined in accordance with all evidence admitted: plaintiff's and defendant's.*

*Sanders v. Ahmed*, 364 S.W.3d 195, 207 (Mo. banc 2012) (emphasis added). Although Hummel argues that these general principles should not apply in the circumstances of this case, we are bound by cases like *Sanders v. Ahmed*, and we will accordingly assess the sufficiency of the evidence to support the jury's verdict, based upon <u>all</u> of the evidence which was before the jury at the time it rendered that verdict.

16

"The usual test for a causal connection between a defendant's negligence and a plaintiff's injury is whether the facts in evidence show that the injury would not have been sustained but for the negligence." *Delisi*, 701 S.W.3d at 175. "But for" causation is the minimum causation requirement "because it merely proves that defendant's conduct is causally connected to the plaintiff's injury." *Harvey v. Washington*, 95 S.W.3d 93, 96 (Mo. banc 2003) (citing *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 862 (Mo. banc 1993)).

Hummel suggests that Wickham cannot simultaneously present evidence that both Hummel and Dr. Smith are separate "but-for" causes of her injuries. But the theories Wickham pursued against Hummel and Dr. Smith are not necessarily inconsistent. Stated generally, Wickham presented evidence at trial that Dr. Smith had negligently failed to respond, or had responded inadequately, to the information he received from various nurses on the evening of November 18, and the morning of November 19. Wickham's claim against Hummel, by contrast, alleged that she had been negligent for failing to assess, and advise Dr. Smith of, Wickham's deteriorating condition *on the morning of November 18.* While it was open to Hummel to argue the matter to the jury, there was nothing inherently inconsistent in Wickham simultaneously asserting both of these positions.

Hummel argues that Wickham failed to present evidence that Dr. Smith's treatment of Wickham would have changed, and Wickham's injuries prevented, if Hummel had presented information to Dr. Smith on the morning of November 18 concerning Wickham's deteriorating condition. Hummel's argument simply

17

disregards Dr. Smith's testimony.[10] Dr. Smith expressly testified that, if he had been advised earlier of "any neurovascular assessments or any neurological problems":

> I would have acted upon them. Based upon some of the testimony that I've heard over the last couple of days, I would have gotten in my car and driven to the hospital and assessed Ms. Wickham and ordered tests and called other doctors. But I was given no indication that there was anything that I needed to assess or treat at that point in time.

Later, Dr. Smith testified at length concerning the actions he would have taken if Hummel had provided her with the information which Hummel possessed concerning Wickham's condition:

> Q. Okay. So, Doctor, just to summarize your testimony here today, we know that with regard to the morning hours leading up until 12:00 or even 12:18 p.m., you were never notified by Nurse Hummel about the substantial increase in pain from what you had seen with the patient, you had not been advised of the abnormal dorsiflexion and plantar flexion, you also had not been advised of the calf pain or calf soreness as described with dorsiflexion and with palpation, and you also didn't have an opportunity to find out about the ultrasound because nobody notified you about those results. Isn't that true?
> A. That is correct.
> Q. And you've testified -- the jury has heard you -- that if you'd heard about all of that information, you would have issued -- you would have come to the hospital or made sure that someone was there who could properly assess the situation and arrange for the care that Ms. Wickham needed; is that true?
> A. Yes, that is correct.

\*\*\*

> Q. And you've testified that if you'd been notified at 12:00 about these findings, you would have come to the hospital to assess the patient, correct?
> A. I would have gone down three floors to see the patient.
> Q. And that was to determine where the problem lay, correct?

---

[10] On appeal, Hummel does not separately argue that the quoted testimony was inadmissible. Given that no admissibility issues have been raised on appeal, this testimony "'may be relied upon for purposes of determining the submissibility of the case.'" *Sanders*, 364 S.W.3d at 209 (quoting *Washington v. Barnes Hosp.*, 897 S.W.2d 611, 616 (Mo. banc 1995)).

18

A.     Or if there was a problem, yes.

\*\*\*

Q.     Right. But if you had come to see the patient, you would have wanted to gather all of the information, not just what had been documented in regard to neurovascular findings, but, potentially, you would have wanted to see that ultrasound report to see what it shows, correct?

A.     Yes.

Q.     All right. If you had all of that information, it would have helped you in determining, there is a problem here. This patient needs to go back to the OR, or I need to get the vascular surgeon involved.

Would you agree?

A.     I -- I think if I had had all of that information and could have put it all together at that time, at a minimum, I would have ordered additional testing that would have revealed the problem.

Q.     All right. And would you have ordered that testing on an expedited basis? Correct?

A.     Oh, yes.

Thus, the premise of Hummel's Points II, V, and VI – that Wickham presented no evidence that Wickham's course of treatment would have been altered if she had better advised Dr. Smith – is simply inaccurate.

More generally, we note that in *Callahan*, the Missouri Supreme Court addressed the causation standard on a claim that a nurse failed to inform a treating physician of a patient's condition. 863 S.W.2d 852 (Mo. banc 1993). The Court stated, "If [the nurse] failed to inform [the doctor] of [the patient's] presence and condition at the hospital, and the doctor had no other source of this information, then a jury could have concluded that 'but for' the nurse's failure to inform the doctor, [the patient] would not have [been injured]." *Id.* at 862. On the other hand, the Court pointed out that if the treating physician had another way to discover the information the nurse had, then the nurse's "failure to tell the doctor something that he already knew would not be causal," which was simply not the case here. *Id.*

19

As we read *Callahan*, a nurse's failure to inform a doctor of a patient's condition can be the but-for cause of the patient's injury when the doctor had no other way of obtaining that same information, and the information would otherwise lead a reasonable physician to act, even without evidence as to how a particular physician would have responded to the information the nurse failed to report. This is consistent with products liability decisions involving failure-to-warn claims, which hold that, in order to establish proximate causation,

> "plaintiffs must show that a warning would have altered the behavior of the individuals involved in the accident." To satisfy this burden, "Missouri, like several other states, aids plaintiffs in proving this second part of causation by presuming that a warning will be heeded." But the "presumption that plaintiffs will heed a warning assumes that a reasonable person will act appropriately if given adequate information. Thus, a preliminary inquiry before applying the presumption is whether adequate information is available *absent* a warning." Moreover, "[a]s causation is a required element of the plaintiffs' case, the burden is on plaintiffs to show that lack of [prior] knowledge."

*Moore v. Ford Motor Co.*, 332 S.W.3d 749, 762 (Mo. banc 2011) (citations omitted) (emphasis in the original). "'[T]he term "presumption" is used to mean "makes a prima facie case," i.e., creates a submissible case that the warning would have been heeded.'" *Id.* at 762 (quoting *Tune v. Synergy Gas Corp.*, 883 S.W.2d 10, 14 (Mo. banc 1994)). Once a plaintiff has established a presumption that a failure to warn proximately caused the plaintiff's injuries, the defendant can present evidence that a warning would not have been heeded, to seek to rebut the presumption. *Id.* at 763.

This standard guides the evidence Wickham was required to present to the jury to make a submissible case against Hummel. To make a submissible case on causation, Wickham needed to present evidence that, on the morning of November

20

18, Hummel had information that she did not share with Dr. Smith which Dr. Smith could not otherwise discover within the time window provided in the verdict director, and which information would have led a reasonable physician in Dr. Smith's circumstances to act to address the situation.

Much of Hummel's argument focuses on Dr. Smith's behavior on the evening of February 18 and the morning of February 19, when he was provided information by *other* medical staff, and after the critical time window provided in the verdict director. Not only was this a time when Hummel was not working at the hospital, it was well after that crucial time when Hummel's assessment of Wickham and notification of Dr. Smith should have occurred. Accordingly, while Hummel was entitled to argue to the jury that Dr. Smith's later actions demonstrated that he would not have made different treatment decisions if provided with similar information on the morning of November 18, that evidence was not relevant to determining whether Wickham made a submissible case against Hummel. Wickham's case against Hummel was not contingent upon evidence as to the specific manner in which Dr. Smith would have responded to Hummel's information.

Wickham needed to present evidence to prove that if Hummel had contacted Dr. Smith between 8:00 a.m. and noon, Wickham's outcome would have been different. Hummel essentially argues that Wickham failed to present such evidence. This is simply not the case.

First, Hummel knew information about Wickham's condition that she neither shared with Dr. Smith nor added to Wickham's chart. The jury heard evidence that

21

Hummel's 8:00 a.m. examination of Wickham revealed troubling neurovascular findings, and that Hummel did not immediately contact Dr. Smith. Hummel herself testified that she was concerned about Wickham's condition during the morning hours, because Wickham was experiencing increased pain and decreased function in her leg.

Despite her concern and the concerns expressed by the physical therapist, there are no records of Hummel contacting Dr. Smith between 8:00 a.m. and noon on February 18. Further, Hummel either did not perform or did not chart any examination of Wickham at noon, despite standing orders to assess Wickham every four hours. Hummel did not contact additional medical personnel to examine Wickham, including Dr. Smith, until after 5:00 p.m. on February 18 when the STAT team insisted she do so.

Taken together, Hummel's failure to contact Dr. Smith and lack of documentation indicates that Hummel knew information about Wickham's deteriorating condition that Dr. Smith did not know and had no other way to learn except from Hummel. Further, Hummel's lack of documentation rendered Dr. Smith unable to fully access Wickham's condition even if he had been advised of Wickham's downturn.

Wickham also presented evidence that the information Hummel could have conveyed would have led a reasonable physician in Dr. Smith's position to take remedial action. Dr. Smith himself testified that information of a "dramatic elevation in pain," newly developing calf pain, and changes in dorsiflexion and plantar flexion

"together are very concerning things that need quick action." Wickham's experts similarly testified that this combination of symptoms presented an emergency requiring immediate intervention.

Additionally, Wickham presented evidence that early intervention was important in maintaining the function of her left leg. Wickham presented expert testimony that a vascular surgeon would have been able to restore full function to her left leg if a surgeon had been contacted at or before 3:00 p.m. on February 18, the day Hummel was monitoring Wickham and failed to either properly assess Wickham or properly notify Dr. Smith. That same expert testified that any delay in Wickham receiving the surgery she needed led to ongoing damage to her leg's function. The expert ultimately testified that the sooner Wickham received the surgery, the less nerve dysfunction she would have experienced. This testimony combined with the evidence that Hummel did not contact Dr. Smith or perform neurovascular assessments on Wickham as ordered was sufficient to allow the jury to find that but-for Hummel's conduct, Wickham's outcome would have been different.

In short, the issue of Hummel's negligence does not hinge on whether Dr. Smith was also negligent, nor does her negligence depend on evidence permitting a prediction concerning Dr. Smith's potential behavior. The evidence needed to make a submissible case against Hummel stands on its own. *See Callahan*, 863 S.W.3d at 862. Wickham presented evidence that Hummel had information that Dr. Smith needed to know and had no other way of accessing. Such evidence, combined with the expert testimony that this information would have indicated to a reasonable

23

physician that Wickham was experiencing an emergency and that early intervention was important in this case, is sufficient to submit to the jury that, but for Hummel's failure to contact Dr. Smith or failure to properly assess Wickham, Wickham's outcome would have been different. Wickham made a submissible case against Hummel on the element of causation.[11]

Points II, V, and VI are denied.

**Point I**

Hummel also argues that Wickham failed to make a submissible case in that Wickham's proof of causation was foreclosed by alleged judicial admissions made in her petition.

"A judicial admission is an act done in the course of judicial proceedings that concedes for the purpose of litigation that a certain proposition is true." *Moore Automotive Group, Inc. v. Goffstein*, 301 S.W.3d 49, 54 (Mo. banc 2009). Allegations in a petition can constitute judicial admissions when they are admitted by the opposing party. *Holdredge v. Mo. Dental Bd.*, 261 S.W.3d 690, 693 (Mo. App. W.D. 2008). "A judicial admission must be clear and unqualified." *Goudeaux v. Bd. of Police Com'rs of Kansas City*, 409 S.W.3d 508, 519 (Mo. App. W.D. 2013) (quoting *Chilton v. Gorden*, 952 S.W.2d 773, 777 (Mo. App. S.D. 1997)).

---

[11] Hummel also argues that Wickham failed to prove a case against Hummel because Wickham presented "inconsistent factual theories." To support this contention, Hummel relies on allegations Wickham made in her Seventh Amended Petition that she did not present to the jury. Whether acts of negligence that the jury did not consider conflict with the acts of negligence they did consider is irrelevant to the sufficiency of Wickham's evidence against Hummel. We do not consider Wickham's claims that she did not submit to the jury in this appeal.

Hummel argues that Wickham made two allegations in her Seventh Amended Petition that constitute judicial admissions:

15. On February 18, 2016, Defendant Dr. Smith received multiple notifications of Plaintiff Wickham's deteriorating condition following her total knee replacement surgery.
16. Defendant Dr. Smith did not come to examine Plaintiff Wickham despite the notifications received from the various nurses at North Kansas City Hospital.

Initially, we note that Hummel's response to Paragraph 15 does not admit the allegations of such paragraph at all, and therefore it cannot be deemed an admission.[12] In answering Paragraph 15, Hummel stated, "Defendant admits that Dr. Smith was timely notified of [Wickham's] medical condition. Otherwise, Defendant is without knowledge or information sufficient to form a belief as to the truth, meaning, or intent of the remaining allegations contained in Paragraph 15 of the Petition." Hummel's statement that "Defendant admits that Dr. Smith was timely notified of [Wickham's] medical condition[,]" is not responsive to Paragraph 15's allegation, but rather rephrases Wickham's allegation altogether. Wickham did not allege *timely* notification; she alleged *multiple* notifications. The remainder of Hummel's response to Paragraph 15, that she had insufficient information or knowledge to form a belief as to the truth of the allegation, is not an admission of the Paragraph 15 allegations either, but merely states she cannot speak to the allegations' truth. Because Hummel did not admit the allegations of Paragraph 15, they could not constitute judicial admissions. *See Holdredge*, 261 S.W.3d at 693.

---

[12] We further note that Dr. Smith denied both Paragraph 15 and 16.

Regardless, neither Paragraph 15 or 16 of the petition are relevant to the issue before the jury and cannot be deemed admissions benefitting Hummel. The issue before the jury was whether Hummel failed to properly assess Wickham, or failed to notify Dr. Smith of Wickham's deteriorating condition, between 8:00 a.m. and around noon. Even if Paragraph 15 was deemed an admission, which we do not find, the fact that Dr. Smith received multiple notifications of Plaintiff Wickham's deteriorating condition is not dispositive upon whether *Hummel* (or anyone else) notified him during the hours of 8:00 a.m. and around noon. Paragraph 16, admitted in full by Hummel, merely alleges that Dr. Smith did not examine Wickham despite notifications from "various nurses." As with Paragraph 15, this does not address whether *Hummel* notified him during the hours of 8:00 a.m. and around noon. Neither Paragraph 15 or 16 is relevant to the dispositive issue at hand. Point I is denied.[13]

## Damages (Points VIII, IX, and X)

Finally, we address Hummel's arguments regarding the jury's damages award.

---

[13] Hummel also argues that Wickham made judicial admissions during her opening statement. Specifically, Hummel argues that Wickham's statements that "When Nurse Hummel belatedly alerted Dr. Smith to the sound of the smoke detector, he didn't take it very seriously…. When the night nurse alerted Dr. Smith to the sound of the smoke detector in the evening…he still didn't take it seriously. Even when the orthopedic nursing supervisor alerted Dr. Smith to the sound of the smoke detector, he didn't take it seriously…." These "judicial admissions" fail for the same reason as we explain above. They are not sufficiently clear or unqualified to establish as a matter of law how Dr. Smith would have reacted if Hummel had notified him of Wickham's deteriorating condition on the morning of November 18. In fact, Wickham's opening statement acknowledges that any notification Hummel made to Dr. Smith was "belated."

**Point VIII**

In Point VIII, Hummel argues that the trial court erred in denying her motion for directed verdict because Section 538.215 requires future medical expenses be expressed in present value, and Wickham did not present any evidence of the present value of her future medical expenses.

Section 538.215.1 requires the trier of fact to itemize any damages found against a health care provider into several categories: (1) past economic damages; (2) past noneconomic damages; (3) *future medical damages*; (4) future economic damages (excluding future medical damages); and (5) future noneconomic damages. (emphasis added). Section 538.215.2 states that all future damages "shall be expressed by the trier of fact at present value."

The Missouri Supreme Court has squarely rejected Hummel's argument that Wickham was required to present evidence of the present value of her future medical expenses. *See Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 762 (Mo. banc 2010) (stating that "[i]t is correct that § 538.215 states that the trier of fact is required to express future damages at present value, but there is no authority to support [the] argument that the [plaintiffs] are obligated to present evidence as to present value.").

In *Klotz*, the Missouri Supreme Court noted that plaintiffs were not required to present evidence reducing a future award to present value, and also pointed out that defendants are allowed to argue that future expenses be reduced to present value. *Id.* at 762-63; *see also Anglim v. Mo. Pacific R.R. Co.*, 832 S.W.2d 298, 308-09 (Mo. banc 1992) (stating that a jury was capable of making a present value reduction

to a damages award without the aid of expert testimony as it is a matter of the "plainest fact" that a "dollar today is not the same thing as a dollar payable some years from now…."). When a defendant argues that a plaintiff did not offer any evidence of the present value of their future medical expenses but did not also provide the jury with that information, the defendant seeks "relief from the consequences of their own actions." *Klotz*, 311 S.W.3d at 763 (quoting *Neeselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371, 388 (Mo. banc 1986)).

Here, Hummel did not argue to the jury that Wickham's future medical expenses should be reduced to present value. Hummel also does not argue that the trial court prevented her from presenting her own evidence reducing any claim of future damages to present value. She cannot now argue for relief from her own inaction. Section 538.215 does not require a plaintiff to present evidence of the present value of future damages, nor does it prohibit a defendant from offering that same evidence. The trial court did not err in denying Hummel's motion for directed verdict. Point VIII is denied.

**Point IX**

Next, in Point IX, Hummel argues that it was an error to give Instruction No. 12, identical to Missouri Approved Instruction ("MAI") 21.05, because it failed to instruct the jury to express future medical damages at present value as required by Section 538.215.

**Standard of Review**

"Whether a jury was properly instructed is a question of law this Court reviews de novo." *Hayes v. Price*, 313 S.W.3d 645, 650 (Mo. banc 2010). We review the record in the light most favorable to the submission of the instruction. *Id.* "'A faulty instruction is grounds for reversal if the defendant has been prejudiced.'" *Children's Wish Foundation Intern., Inc. v. Mayer Hoffman McCann, P.C.*, 331 S.W.3d 648, 650 (Mo. banc 2011) (quoting *State v. Carson*, 941 S.W.2d 518, 523 (Mo. banc 1997)). "Prejudicial error 'is an error that materially affected the merits and outcome of the case.'" *Templemire v. W & M Welding, Inc.*, 433 S.W.3d 371, 385 (Mo. banc 2014) (quoting *D.R. Sherry Const., Ltd. v. Am. Family Mut. Ins. Co.*, 316 S.W.3d 899, 904 (Mo. banc 2010)).

**Analysis**

Instruction No. 12 stated in relevant part, "The phrase 'future medical damages' means those damages arising in the future from pecuniary harm such as medical expenses for necessary drugs, therapy, and for medical, surgical, nursing, X-ray, dental, custodial, and other health and rehabilitative services." This instruction is identical to MAI 21.05.

Hummel offered an alternative instruction not found in MAI, which added the following language to MAI 21.05: "Any future damages shall be expressed at present value." Hummel also requested that this sentence be added to the "Note" section of the verdict director.

"The law is well-settled that where an MAI instruction applies to the case, the use of such instruction is mandatory." *Syn, Inc. v. Beebe*, 200 S.W.3d 122, 128 (Mo. App. W.D. 2006) (citing *Clark v. Mo. & N. Ark. R.R.*, 157 S.W.3d 665, 671 (Mo. App. W.D. 2004)); *see also* Rule 70.02(b)[14] ("Whenever Missouri Approved Instructions contains an instruction applicable in a particular case that the appropriate party requests or the court decides to submit, such instruction shall be given to the exclusion of any other instruction on the same subject."). We have previously noted that the MAI itself warns:

> You may have the ability to improve an instruction in MAI but you do not have the authority to do it. Do not do it. The use of a provided MAI is mandatory. If you think the change of a word or phrase will make it a better instruction, do not do it. You will be falling into error if you do.

MAI, "How To Use This Book" (7th ed.); *see also Kelly v. City of Lee's Summit*, 623 S.W.3d 758, 764 (Mo. App. W.D. 2021). "If, however, a particular MAI does not state the substantive law accurately, it should not be given." *Templemire v. W & M Welding, Inc.*, 433 S.W.3d 371, 376 (Mo. banc 2014).

First, we note it is not an error for the trial court to offer an MAI instruction that is directly applicable. MAI 21.05 defines each category of damages in an action against a medical provider like Hummel. The Missouri Supreme Court is clear that the use of the MAI is mandatory and that it is an error to edit those instructions, even if a party believes the edit is an improvement.

---

[14] All rule references are to the Missouri Supreme Court Rules (2022), unless otherwise indicated.

Further, Hummel cannot prove she was prejudiced by Instruction No. 12. Hummel argues that the jury could not know to reduce future medical damages to present value when no evidence was presented and they were not instructed to do so, yet she failed to provide the jury with such evidence. As we explain above, Hummel essentially argues that she was prejudiced by her own inaction. Hummel could have elicited evidence regarding the present value of Wickham's future medical damages and could have made argument to that effect during closing, but she did neither. Hummel cannot now argue that the jury would have returned a different decision if Hummel's "improved" version of MAI 21.05 had been read to the jury because Hummel offered no evidence or argument to support what she believes would be the present value of the future medical damages. Nor can Hummel prove the outcome would have been different if her proposed instruction would have been used and, consequently, cannot prove she was prejudiced by Instruction No. 12. Point IX is denied.

**Point X**

Hummel argues that the trial court misinterpreted Section 538.220 by reducing the periodic payments of future medical expenses by 73% to advance Wickham's attorney's fees and expenses.

**Standard of Review**

"Entry of, or refusal to enter, a periodic payment schedule is reviewed for abuse of discretion." *Williams v. Mercy Clinic Springfield Communities*, 568 S.W.3d 396, 408 (Mo. banc 2019). "'A trial court will be found to have abused its discretion when

31

a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.'" *Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 760 (Mo. banc 2010) (quoting *Swartz v. Gale Webb Transp. Co.*, 215 S.W.3d 127, 129-30 (Mo. banc 2007)).

**Analysis**

Section 538.220.2 states in part, "At the request of any party to such action made prior to the entry of judgment, the court shall include in the judgment a requirement that future damages be paid *in whole or in part* in periodic or installment payments if the total award of damages in the action exceeds one hundred thousand dollars." (emphasis added).

Likewise, Section 538.220.4 addresses attorney's fees and states,

> If a plaintiff and his attorney have agreed that attorney's fees shall be paid from the award, as part of a contingent fee arrangement, *it shall be presumed that the fee will be paid at the time the judgment becomes final.* If the attorney elects to receive part or all of such fees in periodic or installment payments from future damages, the method of payment and all incidents thereto shall be a matter between such attorney and the plaintiff and not subject to the terms of the payment of future damages, whether agreed to by the parties or determined by the court.

(emphasis added).

The Missouri Supreme Court has interpreted Section 538.220 "to permit the trial court to consider the needs of the plaintiff and the facts of the particular case in deciding what portion of future medical damages will be paid in a lump sum and what portion will be paid out over a periodic payment schedule that accords with the parameters set out in the statute." *Watts v. Lester E. Cox Med. Ctrs.*, 376 S.W.3d 633,

32

647 (Mo. banc 2012). Section 538.220.2 "does not remove from the court its authority to determine what part of the future medical damages shall be subject to the payment schedule." *Id.* The Missouri Supreme Court recently "reaffirm[ed] the holding in *Watts* to the extent the circuit court, under section 538.220.2, has the discretion to determine whether to award future medical damages wholly in periodic payments or in part in a lump sum." *Williams*, 568 S.W.3d at 409 (holding that the circuit court did not err in assigning $10 million of a $21 million future damages award to periodic payments, with the remainder to be paid in a lump sum).

In this case, the trial court set forth the periodic payment of future damages as follows:

> The total amount awarded by the jury for future medical expenses equaled $492,541. After deduction of the proportionate share of attorney fees and litigation expenses that are attributable to the award of future medical expenses, the Court finds that $131,636.16 remains in future medical damages which sum should be paid in periodic or installment payments. The Court finds that the payments should be made in quarterly installments of $4,113.63 over a period of eight years beginning March 1, 2022…. The Court exercises its discretion to award the proportionate share of the total attorney's fees and litigation expenses attributable to future medical payments to be paid at the time of judgment.

Hummel argues that the trial court erred in ordering only a portion of the future medical damages to be paid in periodic installments after deducting attorney's fees and expenses because the trial court lacked the authority to do so. Hummel argues that Section 538.220.2 does not allow for fees or expenses to be "advanced" from future medical damages. But the express language of Section 538.220.2 refutes Hummel's argument. By statute, the trial court is vested with the authority to order future medical payments to be paid in periodic installments "in whole or in part."

33

Nothing in the statutory language disallows the trial court from ordering a portion of the attorney's fees and expenses be paid from the jury's future medical damages award. Hummel asks us to take the statute's silence as evidence that the trial court abused its discretion. However, case law is clear that Section 538.220.2 gives broad discretion to the trial court to determine the needs of the plaintiff and the facts of the case in determining how to allocate payment of future medical damages. Here, the trial court appropriately exercised its discretion here in deducting a *proportionate* share of the attorneys' fees and costs from the future medical payments while deducting the remainder of the fees and costs from the remaining damages. Here, it cannot be said the trial court deducted attorney's fees and costs without justification or explanation.

Notably, Section 538.220.4 states that attorney's fees are presumed paid at the time the judgment becomes final. That subsection also makes clear that the trial court does not have the authority to order attorney's fees be paid in installments, but rather such an arrangement is only between the plaintiff and her attorney. In other words, the trial court may have abused its discretion if it had ordered the total future damages award be paid in installments, with a portion of installments going toward attorney's fees and expenses.

At best, Hummel argues that Section 538.220.2 does not require attorney's fees and expenses to be deducted from future medical damages. However, Section 538.220 expressly allows a court to exercise its discretion in ordering only part of the future medical damages be paid in periodic installments while ordering the remaining

34

portion be paid immediately. The trial court did not abuse its discretion in ordering only part of the future medical damages be paid in periodic installments. Point X is denied.

## Conclusion

The trial court's amended judgment is affirmed.[15]

_____
W. DOUGLAS THOMSON, JUDGE

All concur.

---

[15] On appeal, Wickham requests damages pursuant to Rule 84.19, which permits us to award damages to the respondent if we determine the appeal is frivolous. "An appeal is frivolous if it presents no justiciable question and is so devoid of merit that there is little prospect the appeal can succeed." *St. Charles Cty. v. Wegman*, 90 S.W.3d 142, 145 (Mo. App. E.D. 2002). We exercise awarding damages for a frivolous appeal with caution, because it is a drastic remedy. *Id.* We deny Wickham's request for damages. Even though Hummel's appeal was ultimately unsuccessful, we find that it was not frivolous.